[Cite as *State v. Granakis*, 2017-Ohio-8428.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | C.A. No. 15AP0053 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| CARY R. GRANAKIS | WAYNE COUNTY MUNICIPAL COURT COUNTY OF WAYNE, OHIO |
| Appellant | CASE No. 2015 CR-B 000085 |

DECISION AND JOURNAL ENTRY

Dated: November 6, 2017

TEODOSIO, Judge.

{¶1}     Appellant, Cary R. Granakis, appeals from his convictions in the Wayne County Municipal Court.  We affirm.

I.

{¶2}     On the night of December 22, 2014, Sergeant Eric Peters of the Wayne County Sheriff's Office was dispatched to a residence for a domestic violence complaint.  He spoke to the victim ("K.D.") and her mother at the home.  K.D. told the officer that she had a confrontation with Mr. Granakis over his attempted removal of a fan from their upstairs bedroom.  She attempted to block the doorway so Mr. Granakis could not remove the fan, and he grabbed her arm, pushed her, and swatted her face.  K.D. was upset, crying, and had red marks on her nose and arm.  She told the officer that she was fearful due to this incident and prior incidents with Mr. Granakis, including a time when he poured body wash and talcum powder on her and shook her head back and forth.  Mr. Granakis was no longer in the residence when the

police arrived, but he called K.D. while police were still present. Sergeant Peters spoke to Mr. Granakis on the phone and asked him to return to the residence. Mr. Granakis returned and spoke to the officer, but only admitted to grabbing K.D.'s arm to move it since she was blocking the doorway. No one was arrested that night, but Mr. Granakis was later charged with domestic violence for the December 22nd incident in January of 2015.

{¶3} In June of 2015, police interviewed K.D. about the domestic violence incident, and she also discussed past undocumented incidents of physical violence with Mr. Granakis, including the body wash and talcum powder incident and another time when he hit her so hard that she was off work for approximately one week. Soon thereafter, Mr. Granakis was charged with seven more offenses.

{¶4} After a jury trial, Mr. Granakis was convicted of three counts of domestic violence, one count of aggravated menacing, and one count of menacing by stalking. The trial court ordered a pre-sentence investigation report and subsequently sentenced Mr. Granakis to 360 days in jail, fines, and costs. The jail sentence was suspended and Mr. Granakis was placed on 36 months of community control. The sentence was stayed pending appeal.

{¶5} Mr. Granakis now appeals from his conviction and raises five assignments of error for this Court's review.

{¶6} For ease of analysis, we will rearrange and consolidate some assignments of error.

II.

**ASSIGNMENT OF ERROR ONE**

CHARACTER EVIDENCE WAS IMPROPERLY ADMITTED AT TRIAL BECAUSE GRANAKIS DID NOT PUT HIS CHARACTER INTO QUESTION.

**ASSIGNMENT OF ERROR TWO**

OTHER ACTS EVIDENCE WAS IMPROPERLY ADMITTED AT TRIAL BECAUSE ITS ONLY LOGICAL PURPOSE WAS TO SHOW CONFORMITY THEREWITH AND THE STATE DID NOT GIVE PROPER NOTICE.

{¶7} In his first assignment of error, Mr. Granakis argues that the trial court committed plain error by improperly admitting character evidence in its case-in-chief prior to Mr. Granakis testifying and "the effect of this prejudicial disadvantage clearly affected the outcome of the trial." In his second assignment of error, Mr. Granakis argues that the trial court erred by improperly admitting the same testimony as "other acts" evidence. We disagree with both propositions.

{¶8} "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion," except "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible * * *." Evid.R. 404(A)(1). Thus, "the Supreme Court of Ohio has held that when a defendant offers evidence regarding his good character, the introduction opens the door for the prosecution to inquire about a defendant's bad character." *State v. Mills*, 9th Dist. Medina Nos. 02CA0037-M, 02CA0038-M, 2002-Ohio-7323, ¶ 54, citing *State v. McGlaughlin*, 9th Dist. Summit No. 19019, 1998 Ohio App. LEXIS 5484, *5 (Nov. 18, 1998), citing *State v. Wright*, 48 Ohio St.3d 5, 8 (1990).

{¶9} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). Trial courts conduct a three-step analysis in determining whether to admit other acts evidence:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*State v. Baskerville*, 9th Dist. Summit No. 28148, 2017-Ohio-4050, ¶ 7, quoting *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20.

{¶10} "The admission or exclusion of evidence rests soundly within the trial court's discretion." *State v. Scheck*, 9th Dist. Medina No. 05CA0033-M, 2006-Ohio-647, ¶ 13. We review a trial court's decision regarding the admission or exclusion of evidence for an abuse of discretion. *Id.* "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶11} Mr. Granakis argues in his first assignment of error that, prior to his own testimony at trial, the State improperly introduced evidence from several witnesses who testified as to his character and character traits, specifically:

[He] would get mad based on his mannerisms, that he's aggressive, untrustworthy because he goes through other's phones, he argued with his girlfriend, gave out bad vibes based on his actions, made others feel uneasy or pressured, was borderline obsessed talking about [K.D.], made others feel threatened, and yelled at employees due to frustration.

In his second assignment of error, he argues that the improper testimony mentioned many other acts, specifically: "[He] yells at work, gets mad at [K.D.], uses [K.D.] to benefit himself,

provides preferential treatment to [K.D.], goes through employees' property, reduces employees' work hours because they did not cooperate with him, and other acts of intimidation, among other things." Mr. Granakis argues that the evidence is not relevant to the charges and the timeframe of the witnesses' observations cannot be linked to the criminal conduct. The State argues that this testimony was not improper character evidence, but simply observations by the witnesses of Mr. Granakis' controlling, obsessive, and abusive acts toward K.D., which were properly admitted to establish the "engaging in a pattern of conduct" element of the menacing by stalking charge.

{¶12} R.C. 2903.211(A) addresses the offense of menacing by stalking and states: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person * * *." A "pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents * * *." R.C. 2903.211(D)(1). "Mental distress" is defined as: (1) "[a]ny mental illness or condition that involves some temporary substantial incapacity" or (2) "[a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. 2903.211(D)(2).

{¶13} Mr. Granakis and K.D. both worked at Jake's Steakhouse in Wooster. Mr. Granakis was a manager and K.D. was a server. Several of their co-workers testified as to their own personal interactions with Mr. Granakis as well as their observations of Mr. Granakis' interactions with K.D. at work.

{¶14} T.P. was a co-worker of both Mr. Granakis and K.D. She testified that Mr. Granakis would show favoritism toward K.D. when it came to scheduling, although he would often give her too many tables to handle. T.P. observed Mr. Granakis getting angry with K.D. as well as K.D.'s frustration and frantic attempts to please him. Mr. Granakis and K.D. would argue, and T.P. noticed black eyes on K.D. a couple of times. After K.D. stopped working at Jake's, Mr. Granakis would "barrage" her about K.D. and this case during every shift that T.P. worked. He would become increasingly aggressive in talking about K.D. and would ask T.P., "Have you talked to her? Have you seen her?"

{¶15} M.S. is T.P.'s fiancé and also worked at Jake's with Mr. Granakis and K.D. He testified that Mr. Granakis admitted to going through M.S.' cell phone and accused M.S. of receiving pictures from K.D. on his cell phone. He also testified that "one time [Mr. Granakis and K.D.] came into work and they seemed like they were having a little bit of an argument," but other than that he did not witness anything. M.S. feared for K.D. based on a "vibe" from Mr. Granakis and "[j]ust the stuff that he did to [M.S.], that [M.S.] heard him say. Just, it all changed. Once [M.S.'] privacy had been invoked * * *."

{¶16} A.M. is T.P.'s daughter and also worked at Jake's with Mr. Granakis and K.D. She testified that Mr. Granakis asked her to fill out character statements regarding both him and K.D. two or three times a week for a long time, but she felt pressured, uneasy, and uncomfortable about it, so she refused his requests. Mr. Granakis "kept trying to bring [A.M.] into it by talking about it, asking questions, and asking [her] to fill out statements." He would ask her if K.D. had been to her house and if T.P. had been talking to K.D. Mr. Granakis spoke to A.M. about K.D. "[s]everal times. Anytime, any chance he got, it was borderline obsession * * * he would just

bombard [her] with it." Mr. Granakis asked anybody he could for statements and "[s]everal people felt harassed because not everybody came forward."

{¶17} A.F. also worked at Jake's with Mr. Granakis and K.D. She testified that Mr. Granakis treated K.D. differently from other employees and that he admitted to A.F., "I don't mean to be hard on her[,] but I expect more of her because we are dating." After this case began, Mr. Granakis spoke to A.F. about K.D. and said, "[T]hat bitch deserves what she gets." A.F. had previously written a positive statement for Mr. Granakis in his DUI case. Mr. Granakis asked A.F. to write another positive statement for him as well as a negative statement about T.P.

{¶18} We first note that Mr. Granakis did not object to any of this evidence being admitted at trial and has thus forfeited all but plain error. *See State v. Brantley*, 9th Dist. Wayne No. 27466, 2016-Ohio-4680, ¶ 71. Mr. Granakis argued plain error in his first assignment of error, but failed to explicitly argue it in his second assignment of error. "This Court has repeatedly noted that it will not sua sponte fashion an unraised plain error argument and then address it" and we could deny his second assignment of error on that basis alone. *State v. Thomas*, 9th Dist. Summit No. 27580, 2015-Ohio-5247, ¶ 9. *See also Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 202, *22 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out"). However, Mr. Granakis has challenged the same testimony in both of these assignments of error for similar reasons under Evid.R. 404, and because we have consolidated them for our analysis we will consider his plain error argument as applying to both assignments of error.

{¶19} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "[The] error must be obvious and have a substantial adverse impact on the integrity of and the public's confidence in judicial

proceedings * * *." *State v. Tichon*, 102 Ohio App.3d 758, 767 (9th Dist.1995). "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Elkins*, 9th Dist. Summit No. 19684, 2000 Ohio App. LEXIS 4670, *25 (Sept. 27, 2000). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶20} In *Curry*, the Supreme Court of Ohio explained that "'other acts' testimony which forms part of the immediate background of the charged crime may be admissible as demonstrating a scheme, plan, or system." *State v. Liddle*, 9th Dist. Summit No. 23287, 2007-Ohio-1820, ¶ 55, citing *State v. Curry*, 43 Ohio St.2d 66, 72-73 (1975). Otherwise, "it would be virtually impossible to prove that the accused committed the crime charged without also introducing evidence of the other acts." *Curry* at 73. "The other acts must concern events which are 'inextricably related' to the alleged criminal act." *Liddle* at ¶ 55, citing *Curry* at 73. For example, prior acts of violence toward a victim are inextricably related to menacing by stalking because they form the foundation of "engaging in a pattern of conduct." *See State v. Pleasant*, 5th Dist. Stark No. 2006 CA 00345, 2007-Ohio-5643, ¶ 22.

{¶21} This Court has previously relied on that same principle, specifically with regard to a conviction for menacing by stalking. *See State v. Halgrimson*, 9th Dist. Lorain No. 99CA007389, 2000 Ohio App. LEXIS 5162, *10-12 (Nov. 8, 2000). The Court stated that "'other acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress.'" *Id.* at *12, quoting *State v. Tichon*, 102 Ohio App.3d 758, 768 (9th

Dist.1995), quoting *State v. Bilder*, 99 Ohio App.3d 653, 658 (9th Dist.1994). The Court stated that "other acts" evidence regarding Halgrimson's physical altercation with his psychiatrist and his arrest stemming from attempts to contact the victim's friends was admissible because it "provided * * * the factual background of the crime charged." *Halgrimson* at *13. We concluded that the evidence was admissible "because it provided information that would show a course of conduct relating to [the stalking of the victim], and therefore, connect[ed] [seemingly innocent acts] to an ongoing course of conduct." *Id.*

{¶22} This Court later cited *Curry* and *Halgrimson* in its analysis of "other acts" evidence being admitted in a menacing by stalking conviction in *State v. Arnott*, 9th Dist. Summit No. 21989, 2005-Ohio-3, ¶ 36-40. The *Arnott* Court concluded that evidence that Arnott followed the victim, forced sexual intercourse, and that the victim's daughter referred to the appellant "terrorizing" the victim and her family for years all related to the menacing by stalking charge as "inextricably related background information necessary to understand the charges and the appellant's course of conduct against [the victim] permitted by Evid.R. 404(B)." *Arnott* at ¶ 41-43.

{¶23} In the case sub judice, the co-workers testified as to their personal interactions with Mr. Granakis specifically related to this case and as to their observations regarding how Mr. Granakis and K.D. interacted with each other in the workplace. Mr. Granakis would show favoritism toward K.D., but also seemingly gave her too much work, which appeared to lead to arguments between them where Mr. Granakis would get angry and K.D. would become frustrated while frantically trying to please him. K.D. also showed up to work with two black eyes a couple of times. Mr. Granakis admitted to one employee that he was "hard" on K.D. because they were dating and also referred to K.D. as a "bitch." Mr. Granakis appeared to be

obsessed with this case and consistently asked the co-workers for information regarding K.D. and for character statements to assist him in the case. Mr. Granakis further invaded the privacy of one co-worker by going through his cell phone and accusing him of receiving pictures from K.D. on his cell phone.

{¶24} We conclude that this evidence was admissible under Evid.R. 404 as inextricably related background information necessary to help the trier of fact understand the menacing by stalking charge and Mr. Granakis' course of conduct against K.D. The co-workers testified as to otherwise innocuous acts of Mr. Granakis such as being angry with K.D., arguing with K.D., being "hard" on her and giving her more work than she could handle, referring to her as a "bitch," appearing obsessed with knowing who K.D. has been talking to and, sending pictures to, and visiting, and K.D.'s appearance at work with black eyes a couple of times. But, these observations could be useful for the jury, particularly in Mr. Granakis' menacing by stalking charge, because his otherwise innocuous acts could be determined to be knowing attempts to cause K.D. mental distress when put into the context of his previous contacts with her. As to Mr. Granakis' argument challenging the timeframe of the witnesses' observations, this Court has held:

> While other acts evidence aimed at showing an idiosyncratic pattern of conduct should not be so remote from the offense charged as to render them non-probative, logic does not require that they necessarily be near the offense at issue in both place and time. The key to the probative value of such conduct lies in its peculiar character rather than its proximity to the event at issue.

(Citation omitted.) *State v. DePina*, 21 Ohio App.3d 91, 92 (9th Dist.1984).

{¶25} Mr. Granakis has failed to demonstrate how, but for the admission of this testimony, the outcome of his trial would "clearly have been otherwise" and he has thus failed to demonstrate prejudice. *See Elkins* at *8. Even without the co-workers' testimony, K.D. testified

similarly as to Mr. Granakis' interactions with her, including that he was very controlling in their relationship, frequently angry with her, often argued with her, called her a "bitch" and a "whore," isolated her from her co-workers and would not allow them in the house, and hit her in the face which gave her two black eyes. Mr. Granakis has also not demonstrated how this case involves exceptional circumstances where plain error must be noticed to avoid a manifest miscarriage of justice. *See Long* at paragraph three of the syllabus. Thus, we cannot conclude that the trial court abused its discretion or committed plain error in allowing the evidence to be admitted at trial.

{¶26} Mr. Granakis' first and second assignments of error are overruled.

## ASSIGNMENT OF ERROR FIVE

GRANAKIS WAS DENIED EFFECTIVE ASSSISTANCE OF COUNSEL BECAUSE COUNSEL FAILED TO OBJECT TO IMPROPER CHARACTER/OTHER ACTS EVIDENCE AND FAILED TO CALL THE VICTIM'S FATHER TO TESTIFY AT TRIAL.

{¶27} In his fifth assignment of error, Mr. Granakis argues that his trial counsel was ineffective for failing to object to the co-workers' testimony and for failing to call K.D.'s father to testify at trial. We disagree.

{¶28} "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). To prove ineffective assistance of counsel, one must establish that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Id.* at 687. Counsel's performance is deficient if it falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Prejudice can be

shown by proving "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus. "[T]he Court need not address both *Strickland* prongs if an appellant fails to prove either one." *State v. Lortz*, 9th Dist. Summit No. 23762, 2008-Ohio-3108, ¶ 34.

{¶29} "[A]s a matter of law, the failure to object to an error at trial may be justified as a trial tactic and thus does not sustain a claim of ineffective assistance of counsel." *State v. Miller*, 9th Dist. Summit No. 23240, 2007-Ohio-370, ¶ 10, citing *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995). "Strategic trial decisions are left to the deference of trial counsel and are not to be second-guessed by appellate courts." *Id.*, citing *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). The record reflects that defense counsel cross-examined some of the co-workers at trial. Counsel questioned T.P. as to whether she ever heard Mr. Granakis threaten K.D. and if Mr. Granakis had ever visited her home. Counsel also questioned A.F. as to when Mr. Granakis was upset with K.D., specifically if it was after he was charged with domestic violence against her. "[W]e will not second-guess defense counsel's trial tactic of not specifically objecting during direct examination and then cross-examining the witness on the same issues." *Miller* at ¶ 11. Moreover, "a failure to object may be considered sound trial strategy in that '[a] competent trial attorney might well eschew objecting * * * in order to minimize jury attention to the damaging material.'" *State v. Charlton*, 9th Dist. Lorain No. 12CA010206, 2014-Ohio-1330, ¶ 54, quoting *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 90. Furthermore, we have also already concluded above that the evidence was admissible under Evid.R. 404.

{¶30} Mr. Granakis also argues that trial counsel was ineffective for failing to call K.D.'s father to testify at trial because the father was Mr. Granakis' friend and "could have testified in Granakis' favor." "'Decisions regarding the calling of witnesses are within the

purview of defense counsel's trial tactics[]' and absent a showing of prejudice, the failure to call witnesses will not be deemed erroneous." *City of Elyria v. Bozman*, 9th Dist. Lorain No. 01CA007899, 2002-Ohio-2644, ¶ 17, quoting *State v. Coulter*, 75 Ohio App.3d 219, 230 (12th Dist.1992). Mr. Granakis has only provided this Court with pure speculation as to what K.D.'s father's testimony could have included. But, this Court "will not engage in speculation in analyzing a claim of ineffective assistance of counsel * * *." *In re G.E.S.*, 9th Dist. Summit No. 23963, 2008-Ohio-2671, ¶ 51. Mr. Granakis has not demonstrated deficient performance or any resulting prejudice.

**{¶31}** Accordingly, we cannot conclude that trial counsel was ineffective for failing to object to the co-workers' testimony or for failing to call K.D.'s father to testify at trial.

**{¶32}** Mr. Granakis' fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR THREE

THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF EVIDENCE, ESPECIALLY WHEN COMPARING TEXT MESSAGES TO THE VICTIM'S TESTIMONY.

**{¶33}** In his third assignment of error, Mr. Granakis argues that his convictions were against the manifest weight of the evidence. We disagree.

**{¶34}** This Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony."

*State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶35} Mr. Granakis challenges the credibility of K.D. and argues that other evidence existed that was either favorable to Mr. Granakis or questioned the accuracy of K.D.'s testimony. He refers specifically to: (1) K.D.'s admission that she fabricated a false positive result on a home pregnancy test; (2) Mr. Granakis' testimony that K.D. took the yellow license plates off of her car and replaced them with regular plates; (3) K.D.'s testimony that she does not believe she has a problem with alcohol; (4) text messages from K.D. professing her love to Mr. Granakis and discussing alcohol and sex; and (5) Mr. Granakis' testimony denying the allegations.

{¶36} K.D. admitted on direct examination that she used a red Sharpie marker to fake a positive result on a home pregnancy test, but testified that she only did it hopes that Mr. Granakis would "keep his hands off of [her]." She admitted that she loved Mr. Granakis, but feared for her safety and did not want to be labeled as an "abused woman." We fail to see how K.D.'s fabrication of a positive home pregnancy test in an imprudent attempt to save her relationship and keep Mr. Granakis from hitting her somehow establishes a credibility issue with her testimony at trial. While the fabrication itself may be inherently deceptive, K.D. openly admitted to her own actions during her testimony and gave plausible justifications for those actions. "[T]he jury is free to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35.

{¶37} Likewise, we fail to see how Mr. Granakis' testimony that K.D. removed the yellow, restricted license plates from her car and replaced them with regular ones, even if true,

established a credibility issue with K.D.'s testimony as to the crimes Mr. Granakis committed against her. The jury was free to disbelieve all or part of Mr. Granakis' testimony and such a decision does not equate to a manifest miscarriage of justice. *See State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 18. *See also Prince* at ¶ 35.

{¶38} K.D. testified that she did not believe she had a problem with alcohol, although she admitted to having been twice convicted of DUI. When questioned further as to whether that indicates a problem, she testified, "I think it's a problem that I got two DUI's[,] but I am not an alcoholic." The question was clarified for her and K.D. admitted that alcohol negatively affected her life. When asked again if she thought she *had* a problem with alcohol, she said yes, but when asked if she still *has* a problem with alcohol, she said no. Again, we fail to see how K.D.'s subjective beliefs as to how alcohol has affected her life and whether or not it has been, or still is, a problem in her life calls into question the credibility of her testimony as to Mr. Granakis' crimes.

{¶39} The defense admitted numerous text message conversations between K.D. and Mr. Granakis into evidence at trial, which included both of them saying they love each other and discussing many other topics such as alcohol and sex. Mr. Granakis argues that the existence of these text messages demonstrates that K.D. was never in fear of Mr. Granakis and that he never caused her harm. He argues that the texts contradict her testimony and further proposes the question: "Why would she engage in sexual relations and drink with Granakis if she was so scared to death of him or severely depressed?" K.D. testified extensively as to Mr. Granakis' treatment of her during their relationship and as to her unwavering love for him and hopes that he would somehow change and no longer hit her. If anything, these text messages appear to bolster her testimony that she loved him regardless of his abusive treatment of her. The jury was

presented with all of the evidence in this case, including the testimony and text messages, and we cannot conclude that wild speculation as to how K.D. *should have* acted while in an abusive relationship somehow negatively affects the credibility of her testimony.

{¶40} Apart from the few pieces of evidence Mr. Granakis cites as calling into question K.D.'s credibility in this case, there was a myriad of evidence presented against Mr. Granakis at trial. K.D. testified extensively as to multiple incidents that occurred during her relationship with Mr. Granakis. She testified that Mr. Granakis controlled her money and that anytime she wished to spend more than fifty dollars, it had to be approved by Mr. Granakis. He would isolate her by not allowing her to have any friends in their house. Mr. Granakis would call her "every hour, eight, nine times * * * a day" when he was in jail for thirty days. When they had plans to watch fireworks with K.D.'s family, Mr. Granakis "threw a fit," got angry, and paced around a lot while raising his voice because he did not want to go, which upset her. When they instead watched fireworks together that night, Mr. Granakis became angry, raised his voice, started punching the glove box in K.D.'s car, and started going into a "certain character" by talking in different languages and gibberish, which made her scared and afraid.

{¶41} They went to a "Bonobo" concert the following week and, on the way home, Mr. Granakis became angry because there was no music playing in the car and he wanted to get a hotel room. K.D. testified that: "[H]e threatened me. He said that he wanted to shoot me in the head if he had a gun. He would shoot me in the head. I should just kick you in the face right now. I should just kick you in the face. I wish I could just kill you." She told Mr. Granakis that she was just trying to drive them home and asked him to settle down. Mr. Granakis replied, "We will be fine. We are going to be fine. I just, I wish I had a gun[.] I would shoot you in the head. If I could just kick you in the head right now[,] I would." He started hitting the glove box again

and also started hitting the window "really hard" and K.D. was unsure if it would break. Mr. Granakis soon fell asleep on the ride home and K.D. was afraid that he would wake up and "go into a rage." She was scared that he would hurt her or cause the vehicle to wreck.

{¶42} Although K.D. loved Mr. Granakis, she feared for her safety. She chose to quit her job at Jake's in hopes that not working together would improve their relationship and Mr. Granakis would not be so angry at her. After almost every shift, Mr. Granakis would accuse K.D. of cheating on him with the manager at her new job, which made her feel terrible.

{¶43} After K.D. was convicted of a DUI, Mr. Granakis was angry, gave her a "hard time[,]" and would tell her that she was a "fuck up" and "stupid[,]" which made her feel terrible, depressed, and embarrassed. Mr. Granakis would have "anger outbursts" both at home and at work. He would throw food at K.D. and say, "abbha jeeba[.]" He would call her a "bitch[,]" a "whore[,]" and "damaged goods."

{¶44} The two would have yelling arguments and Mr. Granakis would hit K.D. The first time he hit her occurred when she woke up at two or three o'clock in the morning and smelled smoke in the house. Food was burning on the stove and Mr. Granakis was sleeping on the couch. When she woke him up, he became mad, starting talking in a weird language, pushed her over, got on top of her, and started "wailing on [her] back." K.D. still has a scar on her elbow from when Mr. Granakis pushed her over and she slid across the rug, which she showed to the jury. She had bruises on her back and ribs. She could not sleep on her side and had trouble taking deep breaths. She was not able to work for several days, but did not go to the hospital because she did not want to be known as an "abused woman" and did not want Mr. Granakis to get in trouble since he was on probation. She testified that she was afraid for her life at this time.

Her work schedule and timesheet were admitted as evidence, showing that she missed a stretch of eight days of work between November 11th and November 20th.

**{¶45}** Mr. Granakis became increasingly more angry and irritated in the relationship. K.D. testified that he would destroy property when he was drunk or angry. One night he "ripped the stair pole off of the steps and it snapped in half and he just shook it" at K.D. She ran into the upstairs bedroom and could hear Mr. Granakis "wailing on stuff downstairs, breaking stuff." She was afraid he would hit her or stab her with the broken baluster from the stairs. When he became angry, K.D. was terrified because "[h]is face would turn red, real red, and it was like, it just, he went blank in his eyes. It wasn't him. There was no soul there."

**{¶46}** After a yelling argument over K.D.'s request to not have alcohol in the house due to the terms of her probation, Mr. Granakis pushed K.D. As she walked out of the bathroom, he hit her in the face, causing her to fall into the wall and onto the floor. She had bruises on her hands, marks on her face, and ended up with two black eyes. The glasses she was wearing "dug into [her] skin." She still has a mark on her nose from it and her glasses are now broken. Pictures of her injuries were admitted into evidence at trial. K.D. eventually went to the hospital because when she took a shower and blew her nose, it started bleeding and would not stop. Mr. Granakis told her not to go to the hospital, but she went anyway and told the hospital staff that she fell coming out of the shower.

**{¶47}** She testified that she was scared to leave Mr. Granakis not only because of what he could do to her, but because he said that if she ever left him he would try to commit suicide again. One time, Mr. Granakis was angry at K.D. and she started crying. He became very irritated and mad, so he took body wash and poured it all over her head. He then took talcum powder and poured it all over her head and her hoodie. She was scared and crying, so she went

to the kitchen and crouched down on the floor. Mr. Granakis came up to her and said, "[S]top fucking crying." He put both of his hands on the sides of her head and shook her head back and forth really hard. Her neck hurt for some time after that incident.

{¶48} K.D. once used a red Sharpie marker to falsify a positive result on a home pregnancy test in hopes that Mr. Granakis would "keep his hands off of [her]." On December 22, 2014, K.D. told Mr. Granakis that her mom was going to stay for the night so she would not have to drive home during winter that night. Mr. Granakis was "huffing and puffing" and was mad. He was going to sleep in a separate bedroom and he tried to remove a fan from their master bedroom. She asked him what he was doing and he quickly charged at her with the fan. She grabbed onto the door and was scared he was trying to push her down the stairs as he tried to push her out of the way. He then hit her on the side of her face and she screamed for her mother to call 911. She testified that after her relationship with Mr. Granakis ended, she started talking to her counselor about how she had been "push[ing] down inside of her" the trauma from the relationship.

{¶49} Several co-workers of Mr. Granakis and K.D. testified as to Mr. Granakis' behavior toward K.D. at work. Sergeant Eric Peters also testified as to K.D.'s demeanor at the scene after the December 22nd incident as well as the evidence he found and the photographs he took. Videos of Sergeant Peters' body camera were introduced as evidence at trial, showing his interactions with K.D. and Mr. Granakis after the December 22nd incident. Mr. Granakis testified in his own defense and denied the allegations made by K.D.

{¶50} "This Court has repeatedly held that the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. The trier of fact "has the right to

place considerable weight on the testimony of the victim." *State v. Felder*, 9th Dist. Lorain No. 91CA005230, 1992 Ohio App. LEXIS 3916, *3 (July 29, 1992). Mr. Granakis testified and denied the allegations at trial, attempting instead to show the jury that this was a dysfunctional relationship in which K.D. made false allegations against him because he was an easy target. The jury was free to disregard Mr. Granakis' theory. *See State v. Hasenyager*, 9th Dist. Summit No. 27756, 2016-Ohio-3540, ¶ 20. The State's witnesses were all subject to cross-examination. A conviction is not against the manifest weight because the trier of fact chose to credit the State's version of events. *State v. Peasley*, 9th Dist. Summit No. 25062, 2010-Ohio-4333, ¶ 18.

{¶51} After a thorough review of the record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice. *See Otten* at 340. Mr. Granakis has also failed to show that this is an exceptional case where the evidence weighs heavily in favor of the defendant and against conviction. *See Thompkins*, 78 Ohio St.3d at 387.

{¶52} Mr. Granakis' third assignment of error is overruled.

## ASSIGNMENT OF ERROR FOUR

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED GRANAKIS' MOTION FOR A MISTRIAL BECAUSE THE JURY HEARD INADMISSIBLE EVIDENCE REGARDING ANOTHER UNRELATED EVENT.

{¶53} In his fourth assignment of error, Mr. Granakis argues that the trial court erred in denying his oral motion for a mistrial after a witness testified as to a separate incident or accident involving K.D. that is unrelated to this case. We disagree.

{¶54} Pursuant to Crim.R. 33(A), a defendant may move the trial court for a mistrial if his substantial rights are affected by any of a number of factors including "[i]rregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of

which the defendant was prevented from having a fair trial" or "[m]isconduct of the jury, prosecuting attorney, or the witnesses for the state * * *." "The essential inquiry on a motion for a mistrial is whether the substantial rights of the accused are adversely affected." *State v. Damberger*, 9th Dist. Medina No. 3024-M, 2000 Ohio App. LEXIS 3974, *5 (Aug. 30, 2000). "Due to the variety of circumstances in which mistrial may emerge, great deference must be given by a reviewing court to the trial court's discretion as the trial court judge is in the best position to assess the situation and determine whether a mistrial is appropriate." *State v. Wooden*, 9th Dist. Summit No. 21138, 2003-Ohio-1917, ¶ 33. Thus, "[a] trial court's ruling on a motion for a mistrial will be reversed only for an abuse of discretion." *Damberger* at *5. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d at 219. When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons*, 66 Ohio St.3d at 621.

**{¶55}** When asked during direct examination if he ever felt fear for K.D., M.S. replied, "Oh. Yeah, just in the sense of when there was a second I (sic) incident, accident, whatever, that she was hurt, you know, it is starting to become more * * *." Defense counsel immediately objected and, while at side bar, moved the court for a mistrial. After a short recess to review the testimony, the trial court found that M.S.'s answer was inadmissible, but that a limiting instruction could be given to the jury. The court then denied the motion for a mistrial and specifically instructed the jury regarding M.S.'s reference to the second incident or accident as follows: "[Y]ou are not to consider any such testimony for any purposes whatsoever. You are to act as if you never heard that and not consider it for any purpose in your deliberations or in your

analysis of the facts of this case." Mr. Granakis argues that "the damage was done" and the jury could have decided the case based on their feelings for him rather than the facts of the case.

**{¶56}** After a review of the record, we cannot say that the testimony referring to a second incident or accident adversely affected Mr. Granakis' substantial rights or that the trial court abused its discretion in denying Mr. Granakis' motion for a mistrial. After a side bar and short recess to review the testimony, the trial court found the statement to be inadmissible and explicitly instructed the jury to disregard the statement. "A jury is presumed to follow the instructions given by the trial court." *Damberger* at *7. Mr. Granakis has not directed us to any evidence in the record that the jury failed to follow the court's instruction.

**{¶57}** Mr. Granakis' fourth assignment of error is overruled.

### III.

**{¶58}** Mr. Granakis' first, second, third, fourth, and fifth assignments of error are overruled. The judgment of the Wayne County Municipal Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Wayne County Municipal Court, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

SCHAFER, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JOHN BROOKS CAMERON and CHRISTOPHER JANKOWSKI, Attorneys at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and NATHAN R. SHAKER, Assistant Prosecuting Attorney, for Appellee.