[Cite as *State v. Moore*, 2025-Ohio-712.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,

  v.

CECIL C. MOORE,

      DEFENDANT-APPELLANT.

CASE NO. 9-23-83

O P I N I O N

**Appeal from Marion County Common Pleas Court**
**General Division**
**Trial Court No. 21CR0354**

**Judgment Affirmed**

**Date of Decision: March 3, 2025**

**APPEARANCES:**

    *Eric E. Willison* **for Appellant**

    *Allison M. Kesler* **for Appellee**

**MILLER, J.**

{¶1} Defendant-Appellant, Cecil Moore ("Moore"), appeals from the November 28, 2023 judgment of the Marion County Court of Common Pleas. Following a jury trial where he was found guilty of fifteen charges consisting of rape, sexual battery, and gross sexual imposition, the trial court merged the rape and sexual battery charges and sentenced him to a total of 62-1/2 years in prison. In his ten assignments of error, Moore challenges the trial court's sentence and a variety of its rulings during trial. For the reasons that follow, we affirm.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    Indictment and Relationship Between Moore and the Victim

{¶2} On August 18, 2021, Moore was indicted on 15 felony counts, the first five for rape in violation of R.C. 2907.02(A)(2), the second five for sexual battery in violation of R.C. 2907.03(A)(5), and the last five for gross sexual imposition ("GSI") in violation of R.C. 2907.05(A)(1). The indictment alleged the offenses took place during five time periods, and one count for each offense was charged in relation to each time period as follows:

- Counts 1, 6, and 11 – On or about June 1, 2014 through September 20, 2014.

- Counts 2, 7, and 12 – On or about March 15, 2015 through June 20, 2015.

- Counts 3, 8, and 13 – On or about June 21, 2015 through December 31, 2015.

- Counts 4, 9, and 14 – On or about January 1, 2016 through October 11, 2016.

- Counts 5, 10, and 15 – On or about October 12, 2016.

The alleged victim of the offenses was T.G., who was born in February 2001, was 13 years old at the start of the first time period in the indictment, and was 15 years old during the last time period.

{¶3} Around 2004 or 2005, when T.G. was approximately four years old, T.G.'s mother and Moore started a romantic relationship, which included the birth of a child together and continued through the time periods set forth in the indictment. Starting when she was 10 or 11 years old, T.G. lived in Marion with her mother, her two younger half-sisters, and Moore. According to T.G., she had a "typical father-daughter relationship" with Moore while growing up, she would call him "dad," and he would be a parent to her—including helping her with school work, taking her to school events, teaching her how to ride a bike, and disciplining her and her half-sisters. (Trial Tr. at 474-475). With her actual father already out of her life, Moore "was the only real father figure" she had, apart from her grandfather. (*Id.*). T.G. explained that Moore was the general decision maker in the house, and he was very controlling—including not allowing her to have friends come to the house and not allowing her to participate in any extracurricular activities.

### B. Sexual Activity Between Moore and the Victim

**{¶4}** T.G. testified that Moore had sex with her "a lot"—up to eight times a week—between June 1, 2014 and October 12, 2016.[1] (Trial Tr. at 544, 576). However, the evidence focused on five separate incidents, each of which corresponded with one of the five time periods set forth in the indictment and, thus, the indictment included one count of rape, sexual battery, and GSI for each incident. T.G. testified about all five incidents during trial, as follows.

**{¶5}** The first incident involved the first time Moore had sex with T.G. This took place during the summer before she started the eighth grade. After T.G.'s mother left the house, Moore came into T.G.'s room and shut the door. He pulled a condom out of his pocket, hovered over her, told her it would be okay, and penetrated her vagina with his penis. T.G. told him to stop, which he eventually did.

**{¶6}** The second incident took place on the day T.G. returned from her eighth-grade trip to Washington, D.C. Moore picked her up at school in a van and parked in a driveway. He told T.G. to bend over the back seat of the van, pulled her pants down, and proceeded to have anal sex, during which he penetrated her. T.G. felt terrible pain and told him to stop, but Moore did not.

---

[1] Evidence at trial included records showing purchases of Plan B, which T.G. testified was used as one method of birth control.

{¶7} The third incident involved the first time Moore used sex toys with T.G. during sexual encounters. Moore laid T.G. on the bed in his bedroom and tried to insert a dildo into her vagina. He was unable to get the dildo inside of her because it was very large. T.G. testified that Moore "spread [her] open" with his fingers, but the dildo did not get past her "outer vaginal lips." (Trial Tr. at 497, 504). The next day, Moore told T.G. to lay on her stomach on the bed in his bedroom. He then inserted anal beads "all the way" inside of T.G. and, after a minute or two, he pulled them out very quickly—resulting in T.G. suffering a sharp pain. (*Id.* at 503).

{¶8} The fourth incident occurred after T.G. saw that one of Moore's old phones had a Google search for the word "porn." She showed Moore what was on the phone, Moore yelled at her and accused her of doing it, and they got into an argument. After the argument, Moore took T.G. to his bedroom, pulled up pornography on his phone, and stood behind her to see if she was aroused by what was on the phone. Moore held the phone in front of T.G. with one hand while he reached around her with his other hand, placing his hand on her vagina to see if she was aroused while watching the porn on his phone. Although he was touching her vagina with his hand, T.G. could not remember his fingers going inside it. Moore subsequently put the phone away and had vaginal sex with her.

{¶9} The fifth incident involved the last time Moore had sex with T.G. They had sex in Moore's bedroom and then Moore left to go to a casino. T.G.'s mother arrived home about 30 minutes later and, without advanced notice to T.G. or Moore,

T.G.'s mother decided to leave Moore and they all stopped living with him. At the time, T.G.'s mother was unaware of any of the sexual activity that had occurred between Moore and T.G., according to T.G. and her mother.

{¶10} When asked whether Moore would touch her prior having sexual intercourse, T.G. said "yes" and explained: "He would kiss me, and he would touch my breasts, and put his hand in my pants and touch my vagina." (Trial Tr. at 480). According to T.G., there was never a time when she wanted to have sex with Moore. She testified that Moore had warned her that, if she ever told anybody, then her mother would hate her and disown her; Moore would go to jail for the rest of his life, where he would kill himself; her two half-sisters would hate her for it; and she would be disliked and disowned by her family. At the time, T.G. felt that she was protecting her half-sisters because she knew, if the sexual activity was happening to her, then it was not happening to them.

{¶11} T.G. did not tell anyone about the abuse until she was an adult and then only after her young stepson tragically died in August 2020. When her stepson died, it changed T.G.'s outlook on life and she told her mother about the abuse. T.G. explained that she had kept the abuse a secret until that time, and even denied any abuse (including telling one of her half-sisters she had not been raped by Moore and telling a doctor she had not been sexually abused), because part of her felt no one would believe her and the other part of her believed what Moore said about her

mother being angry and her half-sisters disowning her. The police eventually interviewed T.G., which led to the indictment against Moore.

### C. Verdicts and Sentencing

{¶12} During the trial, the jury heard testimony from the following witnesses: Dana Jagger of the Marion City Police Department ("Officer Jagger"), who conducted an investigation in this case; T.G.'s mother; one of T.G.'s half-sisters; Samuel Walter ("Special Agent Walter"), a former sexual assault detective for the Marion Police Department who interviewed Moore; and T.G. herself. The State called all of these witnesses; Moore did not call any witnesses or present any evidence after the State rested its case.

{¶13} The jury found Moore guilty of all 15 counts.[2] At sentencing, the trial court found that each rape count merged with the sexual battery count from the same time period (e.g., Count 1 merged with Count 6). It then sentenced Moore to a term of 11 years in prison for each of the rape convictions and a term of 18 months in prison for each of the GSI convictions. The trial court found that the sentences should be served consecutively, for an aggregate prison sentence of 62-1/2 years. This appeal followed.

## II. ASSIGNMENTS OF ERROR

{¶14} Moore raises ten assignments of error for our review:

---

[2] We note that there was a first trial that resulted in a hung jury. Unless otherwise indicated, this opinion and all references to testimony and evidence relate only to the second trial.

**First Assignment of Error**

**The trial court erred when it convicted Appellant on all 15 counts in the absence of sufficient evidence of force or lack [sic] of force.**

**Second Assignment of Error**

**The trial court erred when it convicted Appellant for sexual battery when the Third Amended Bill of Particulars alleged that the basis for the crime was that Appellant was the stepparent of the alleged victim.**

**Third Assignment of Error**

**The trial court erred when it violated the Appellant's right to confrontation when it improperly restricted the cross examination of witnesses against Appellant.**

**Fourth Assignment of Error**

**The trial court erred when it allowed expert testimony regarding grooming and delayed disclosure when no experts were disclosed, qualified, nor any expert reports filed before trial.**

**Fifth Assignment of Error**

**The trial court erred when it allowed in evidence of prior bad acts which the State of Ohio did not request permission for prior to trial.**

**Sixth Assignment of Error**

**The trial court erred when it did not permit the Appellant to develop evidence on the slipshod nature of the investigation conducted by the State of Ohio.**

**Seventh Assignment of Error**

**The trial court erred when it did not merge the claims for gross sexual imposition into the convictions for rape and sexual battery.**

**Eighth Assignment of Error**

**The trial court erred when it convicted the Appellant for gross sexual imposition on Counts 10-15 of the Third Amended Bill of Particulars.**

**Ninth Assignment of Error**

**The trial court erred when it did not allow cross examination into the alleged victim's bias and motivation to misrepresent.**

**Tenth Assignment of Error**

**The trial court erred when it did not allow the jury to see the full video of the Appellant's interview with Agent Walter.**

## III. DISCUSSION

{¶15} We address the assignments of error out of order in a manner that facilitates our analysis.

### A. First Assignment of Error

{¶16} In the first assignment of error, Moore argues the trial court erred when it "convicted [him] on all 15 counts" because "it is clear that the element of force or threat of force that needs to be present in rape, sexual battery, and gross sexual imposition, is not present." (Appellant's Brief at 3, 12). He contends the State failed to present sufficient evidence of force or threat of force for the offenses.

#### 1. Standard of Review

{¶17} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Dent*, 2020-Ohio-6670, ¶ 15. Thus, our review is de novo. *Id.* A sufficiency challenge disputes whether a party met its burden of production at trial. *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find

the essential elements of the crime beyond a reasonable doubt." *Dent* at ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Thus, "[i]n assessing the sufficiency of the evidence, we do not resolve evidentiary conflicts or assess the credibility of witnesses." *State v. Jackson*, 2023-Ohio-2193, ¶ 26 (3d Dist.); *see also Jenks* at 279.

### 2. Applicable Law

{¶18} Counts 1 through 5 charged Moore with rape in violation of R.C. 2907.02(A)(2), which provided, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Counts 6 through 10 charged Moore with sexual battery in violation of R.C. 2907.03(A)(5), which provided, "No person shall engage in sexual conduct with another, not the spouse of the offender, when . . . [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." As used in both of these statutes, the term "sexual conduct" was defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶19} Counts 11 through 15 charged Moore with GSI in violation of R.C. 2907.05(A)(1), which provided, "No person shall have sexual contact with another, not the spouse of the offender . . . when . . . [t]he offender purposely compels the other person . . . to submit by force or threat of force." The term "sexual contact" was defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶20} Focusing on force, the rape and GSI charges here all involved whether the offender purposely compelled the other person to submit by force or threat of force. Notably, this court has analyzed the "force or threat of force" element for both crimes similarly, at least where the defendant is in a position of authority over the victim. *E.g.*, *State v. Catlett*, 2024-Ohio-386, ¶ 10 (3d Dist.) (explaining that this court applies the Supreme Court of Ohio's discussion of the force-or-threat-of-force element under the rape statute to the GSI statute); *State v. Heft*, 2009-Ohio-5908, ¶ 87-90 (3d Dist.) (relying on principles from caselaw involving forcible rape in assessing a conviction for GSI, where the victim was defendant's stepdaughter and father figure). Also notable is that the Supreme Court of Ohio's caselaw has distinguished between instances when these crimes are committed against children and when they are committed against adults. *Compare State v. Eskridge*, 38 Ohio St.3d 56 (1988) (victim was defendant's four-year-old daughter) *with State v.*

*Schaim*, 65 Ohio St.3d 51, 54-55, 1992-Ohio-31 (1992) (victim was defendant's twenty-year-old adopted daughter; distinguishing *Eskridge*).

**{¶21}** The term "force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). The force necessary depends upon the age, size, and strength of the parties and their relation to each other. *Eskridge* at paragraph one of the syllabus. When the alleged victim is a minor, the force does not need to be overt and physically brutal; it can be subtle and psychological. *Id.* at 58; *State v. Bradshaw*, 2023-Ohio-1244, ¶ 2, 51, 57 (3d Dist.) (involving rapes of niece when defendant's niece was 14 to 16 years old). As long as it can be shown that the minor victim's will was overcome by fear or duress, the forcible element of rape under R.C. 2907.02(A)(2) or GSI under R.C. 2907.05(A)(1) can be established. *Eskridge* at 59 (upholding finding that the four-year-old victim's will was overcome when the child was told to do something by an important authority figure and commanded not to tell anyone about it; thus, the forcible element was established); *Bradshaw* at ¶ 51; *Catlett* at ¶ 10 (affirming GSI conviction; clarifying that the key inquiry in determining whether the State presented sufficient evidence of the force element was whether, based on the totality of the circumstances, the victim's will was overcome by fear or duress). Moreover, both the rape and the GSI statutes specifically clarify that "[a] victim need not prove physical resistance to the offender." R.C. 2907.02(C) and R.C. 2907.05(D).

### 3. Analysis

{¶22} Given that Moore challenges only the sufficiency of the evidence of force or threat of force, we focus solely on whether the State presented sufficient evidence to prove that element. *See State v. Burke*, 2020-Ohio-4781, ¶ 17 (3d Dist.). As an initial matter, even setting aside the fact Moore was not convicted of the sexual battery counts because they merged with the rape counts, neither force nor threat of force is an element for the charged sexual battery counts, i.e., Counts 6 through 10. *See* R.C. 2907.03(A)(5).[3] Therefore, Moore's argument does not apply to those counts and necessarily fails with respect to them.

{¶23} Next, despite the assignment of error challenging all fifteen counts, Moore concedes in his brief that there was sufficient evidence of force or threat of force for the offenses charged in Counts 1, 2, 11, and 12 (i.e., the first two incidents). Regardless, the evidence presented, when viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the element of "force or threat of force" beyond a reasonable doubt for all of the rape and GSI counts. T.G. testified there was never a time when she wanted to have sex with Moore. She further testified that Moore had warned her that, if she ever told anyone about the sexual activity between them, then her mother would hate her and disown her; Moore would go to jail for the rest of his life, where he would kill himself; her two half-

---

[3] We also note the sexual battery charges against Moore were not brought under subsection (A)(1), which involves coercion. R.C. 2907.03(A)(1).

sisters would hate her for it; and she would be disliked and disowned by her family. T.G. also testified that—for years—she did not tell anyone about the abuse because part of her believed what Moore said about her mother being angry and her half-sisters disowning her. Such evidence, at least when viewed in a light most favorable to the State, showed that Moore overcame T.G.'s will by fear or duress while T.G. was a minor and Moore served in a parental role and position of authority. *See Eskridge*, 38 Ohio St.3d at 58.

{¶24} Moore's first assignment of error is overruled.

### B. Eighth Assignment of Error

{¶25} In the eighth assignment of error, Moore argues there was insufficient evidence to prove the GSI in Counts 14 and 15. We apply the same standard of review as in the first assignment of error.

{¶26} First addressing Count 14, Moore says that T.G. testified Moore's "purpose in putting his hand on her vagina was to assure himself (because of his racist beliefs) that she was not sexually aroused by pornography" involving Black people. (Appellant's Brief at 33). He asserts there was no other testimony regarding his purpose for doing so and, "since there was no evidence that [T.G.] was aroused or that [Moore] sought to arouse her or himself, there is insufficient evidence to support" the GSI conviction. (*Id.*). Thus, Moore attacks the offense's requirement that the sexual contact must be touching of an erogenous zone of another "for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶27} T.G. testified as follows: Moore "pulled up porn on his phone and had me lay down, and he was behind me" and "he wanted to see if I was aroused by what was on his phone, which was a black couple having sex." (Trial Tr. at 507). He held the phone in front of her with one hand while touching her vagina with his other "to see if [T.G.] would get wet in any way, aroused while watching the porn on his phone." (*Id.* at 507-508). They had sex after that. (*Id.*). We find that a rational trier of fact, when viewing the evidence presented in a light most favorable to the prosecution, could find beyond a reasonable doubt that Moore touched T.G.'s vagina at least for the purpose of sexually arousing or gratifying himself as evidenced by the fact he had sex with T.G. immediately after watching the pornographic video and touching her vagina.

{¶28} Next, regarding Count 15, Moore says "there was simply no evidence of sexual contact with [T.G.] apart from the alleged rape." (Appellant's Brief at 33). However, when asked whether Moore would touch her prior to having sexual intercourse, T.G. said "yes" and explained: "He would kiss me, and he would touch my breasts, and put his hand in my pants and touch my vagina." (Trial Tr. at 480). According to T.G., there was never a time when she wanted to have sex with Moore. We find that a rational trier of fact, when viewing the evidence presented in a light most favorable to the prosecution, could find beyond a reasonable doubt that Moore made sexual contact with T.G. prior to the rape.

{¶29} Moore's eighth assignment of error is overruled.

### C.    Seventh Assignment of Error

**{¶30}** In the seventh assignment of error, Moore argues that the trial court erred in not merging the rape and GSI convictions during sentencing (like the trial court had for the rape and sexual battery offenses).

### 1.    Applicable Law

**{¶31}** "We review de novo whether certain offenses should be merged as allied offenses under R.C. 2941.25." *State v. Bailey*, 2022-Ohio-4407, ¶ 6. "Merger is a sentencing question, not an additional burden of proof shouldered by the state at trial." *State v. Washington*, 2013-Ohio-4982, ¶ 18. The defendant bears the burden of establishing he or she is entitled to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act. *Id.*

**{¶32}** When a defendant's conduct supports multiple offenses, courts apply the allied offenses analysis in R.C. 2941.25 to determine if the offenses merge or if the defendant may be convicted of separate offenses. *State v. Cass*, 2024-Ohio-2614, ¶ 19 (3d Dist.). The statute states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25. The Supreme Court of Ohio clarified certain aspects of this statute in *State v. Ruff*, 2015-Ohio-995. The court's syllabus held:

> 1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.
>
> 2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.
>
> 3. Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*Id.* at syllabus.

### 2. Analysis

**{¶33}** Contrary to Moore's suggestion, he has not met his burden of establishing that he is entitled to the protection provided by R.C. 2941.25 against multiple punishments for the pairs of rape and GSI offenses committed during each of the five time periods. In other words, merger was not required for those offenses. Evidence supports that the offenses were all committed separately. *See State v. Potts*, 2016-Ohio-5555, ¶ 98 (3d Dist.) (a court may end its analysis upon an affirmative response to any of the three factors—import, conduct, or animus).

**{¶34}** Our analysis within the eighth assignment of error concerning Count 15 is also applicable here. Namely, T.G.'s testimony supported that Moore touched

at least one of her erogenous zones during each incident prior to having sexual intercourse. *See State v. Schroeder*, 2019-Ohio-4136, ¶ 96 (4th Dist.) (GSI and rape convictions did not need to merge when evidence indicated defendant touched the victim's breasts and inserted fingers into victim's vagina, despite their close proximity in time; defendant's conduct constituted two separate and distinct acts); *State v. Foust*, 2004-Ohio-7006, ¶ 145 (acts constituting GSI and rape were separate from each other where victim testified that defendant touched her breasts and put his fingers on her vagina and the evidence did not show he "committed these acts while he was raping" the victim). Furthermore, T.G.'s testimony regarding Moore spreading her vagina open with his fingers and using the dildo the day before he inserted the anal beads provides additional support for separate instances of GSI and rape for Counts 3 and 13. Additionally, as we previously indicated, T.G.'s testimony regarding Moore touching her vagina while displaying pornography on his phone in front of her, before having sexual intercourse, provides additional support for separate instances of GSI and rape for Counts 4 and 14. Therefore, the trial court did not err in deciding not to merge the rape and GSI convictions.

{¶35} Moore's seventh assignment of error is overruled.

### D.      Third and Sixth Assignments of Error

{¶36} In the third assignment of error, Moore contends the trial court violated his right to confrontation when it restricted cross-examination of witnesses

against him.[4] More specifically, the assignment of error focuses on instances where the trial court sustained the State's hearsay objections during Moore's cross-examination of various witnesses. The first category involves a series of questions relating to a police report and to eliciting testimony based on statements in the police report. The second category relates to whether it was permissible for counsel to introduce hearsay statements contained within a cross-examination question. Ultimately, we find Moore's right to confrontation was not violated by the trial court sustaining the State's various objections at issue, or any error was harmless.

{¶37} Moore's sixth assignment of error is closely related to his third assignment of error. He asserts that "the trial court erred when it did not permit [him] to develop evidence on the slipshod nature of the investigation conducted by the State of Ohio." (Appellant's Brief at 3). Moore cites much of the same testimony in support of both assignments of error. In many respects Moore's argument is simply a rehashing of one part of his third assignment of error. Thus, we address both assignments of error together.

---

[4] The assignment of error does not involve the typical Confrontation Clause claim, where the witness does not testify and is unavailable such that the defendant is never confronted with the witness. *See* U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ."); *State v. Leonard*, 2004-Ohio-6235, ¶ 110 ("[t]he admission of hearsay does not violate the Confrontation Clause if the declarant . . . testifies at trial"). All of Moore's arguments are based on statements by persons either who testified at trial or for whom there was no reason to believe they could not have testified at trial (i.e., no showing they were unavailable to testify).

### 1. Standard of Review

{¶38} "The scope of cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case." *State v. McAlpin*, 2022-Ohio-1567, ¶ 151; *see also State v. Robb*, 88 Ohio St.3d 59, 71, 2000-Ohio-275 (2000). Additionally, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus; *State v. Campbell*, 2014-Ohio-493, ¶ 41- 45 (8th Dist.) (trial court did not abuse its discretion in sustaining prosecutor's hearsay objection to testimony concerning contents of police report). Thus, we review the arguments in this assignment of error for an abuse of discretion. A trial court abuses its discretion when its conduct is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9.

### 2. Applicable Law

{¶39} "A defendant's right to cross-examine the state's witnesses is guaranteed by both the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution." *McAlpin* at ¶ 151. While "[t]he Sixth Amendment's Confrontation Clause precludes a trial court from placing 'improper restrictions' on defense cross-examination," it only "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."' (Emphasis in original.) *Id.*, quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987)

and *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985); *see also* Evid.R. 611(B) (scope of cross-examination).

**{¶40}** "To establish a Confrontation Clause violation, [the defendant] must show that he was 'prohibited from engaging in otherwise appropriate cross-examination.'" *Id.* at ¶ 152, quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). An appellate court will not find the trial court erred if "legitimate, legally supportable reasons exist for sustaining" an objection to the portion of cross-examination at issue. *Id.* at ¶ 153-154 (no violation of Confrontation Clause where State's objection during defendant's cross-examination could have been sustained for improper form or lack of foundation).

**{¶41}** Moore's arguments are premised on the trial court sustaining objections to prevent the improper admission of hearsay statements. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement. Evid.R. 801(C). An oral or written assertion is a statement, and a "declarant" is a person who makes a statement. Evid.R. 801(A), (B).

**{¶42}** Police reports are generally inadmissible hearsay. *State v. Leonard*, 2004-Ohio-6235, ¶ 111; Evid.R. 802. However, it is possible that such a report or portions of a report can be admitted if a hearsay exception applies. One potentially applicable exception states, in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.

Evid.R. 803(8)(b). Thus, setting aside other potential admissibility issues, a defendant in a criminal case may be permitted to introduce a favorable police report containing matters observed pursuant to official duty, under Evid.R. 803(8)(b). *E.g.*, *State v. Settles*, 1998 WL 667635, *5 (3d Dist. Sept. 30, 1998). Contrary to Moore's assertions, hearsay statements contained in a public record are not automatically admissible by virtue of their inclusion in an official record. *State v. Mohn*, 2009-Ohio-437 ¶ 26 (12th Dist.). Rather, such statements may be admitted into evidence only if they fall within an additional hearsay exception. *Id.* For example, the contents of a police report may contain hearsay, thus creating a hearsay-within-hearsay issue. Such statements would only be admissible if they fall within the exception enunciated in Evid.R. 805 ("[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules").

### 3.    Analysis

**{¶43}** Turning first to cross-examination that related to her police report, Officer Jagger testified that she conducted an investigation in this case and wrote a

report after reviewing the case file and having a discussion with T.G. over the phone. Initially, Moore complains that the trial court improperly sustained hearsay objections when his counsel "asked questions about the contents of the report." (Appellant's Brief at 16). In reviewing the transcript at this portion of the trial, Moore did not attempt to argue the police report or its contents were not hearsay or that any hearsay exception applied. Moore's counsel indicated he intended to have the officer authenticate the report and to enter it as an exhibit, and he stressed it was Officer Jagger's own report. Based on our review of the record, we find no abuse of discretion. *See State v. James*, 2022-Ohio-3244, ¶ 11-13 (1st Dist.) (court's limitations on defense counsel's cross-examination were not an abuse of discretion in light of the record, including failure by defense counsel to raise an argument to overcome the State's objection).

**{¶44}** During the next set of questions about the police report's contents, Moore's counsel asked Officer Jagger to tell the jury what she learned from T.G. about her half-sisters having information for Officer Jagger to investigate. Moore argued that the statements to be elicited were not being offered to prove the truth of the matter asserted; instead they would describe the process of Officer Jagger's investigation—in order to support Moore's theory that the investigation was sloppy and did not conform to her training because T.G. was the one directing who should be interviewed.

{¶45} We acknowledge that "extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980). However, a statement in the officer's report from T.G. that she wanted Officer Jagger to interview certain people *would be* offered for the truth of the matter asserted. Yet even if the statements were not being offered for the truth of the matter asserted, the barred evidence had limited relevance and would have been cumulative, so we find no abuse of discretion. *State v. Forehope*, 71 Ohio App.3d 435, 443 (5th Dist. 1991) (statements in police report were not offered for truth of matter asserted, but trial court did not abuse its discretion by barring admission because the report was cumulative of other evidence on the issue). Further, a properly formatted question asked of the officer would have resulted in showing why Officer Jagger interviewed T.G.'s half-sisters and allowed counsel to draw the desired inference that T.G. was directing the investigation.

{¶46} Moreover, even if the trial court erred in sustaining this hearsay objection, such error was harmless beyond a reasonable doubt. Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also* Evid.R. 103(A) (effect of erroneous ruling). "During a harmless-error inquiry, the state has the burden of proving that the error did not affect the substantial rights of the defendant." *State v. Morris*, 2014-Ohio-5052, ¶

23. "Whether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial." *State v. Jones*, 2020-Ohio-3051, ¶ 18. If a reviewing court determines that the error did not affect the defendant's substantial rights, then the error is harmless and will be disregarded. *Morris* at ¶ 23.

**{¶47}** Here, the trial court's decision to sustain the hearsay objection did not affect Moore's substantial rights. While it did have some relevance, the testimony to be elicited concerned a relatively peripheral issue and, as the State pointed out at trial, Moore's counsel conducted an in-depth cross-examination into the process of Officer Jagger's investigation and critiqued it. *State v. Lester*, 2004-Ohio-2909, ¶ 27-28 (12th Dist.) (barring police report did not affect a substantial right of the defendant, where defendant explored what he viewed as an inconsistency between the report and the officer's testimony). This included exploring, for example: Officer Jagger's training on report writing and interviewing; the importance of being impartial, timely, accurate, and comprehensive in documenting events; when and how she would document the events of her investigation; her role in the investigation, including developing a rapport with victims so they will trust her; her training and experience with false sex abuse allegations; steps taken in the investigation; how she had not conducted the initial interview of T.G. and did not watch that interview but instead relied on the narrative supplied by the interviewer; and whether she followed her procedures and training in this particular case.

Additionally, Moore's counsel questioned T.G.'s mother, T.G.'s half-sister, and T.G. herself—all of whom testified after Officer Jagger—about their involvement in and knowledge of Officer Jagger's investigation. (*E.g.,* Trial Tr. at 356, 567-568, 572-574). Based on our review of the record, Moore's case was not diminished by the trial court's decision to sustain the State's hearsay objection to defense counsel's attempted improper use of the police report and it did not affect the outcome of the trial. *Lester* at ¶ 27-28 (finding no prejudice to defendant due to police report not being admitted into evidence); *Robb*, 88 Ohio St.3d at 71 (defendant not prejudiced by trial court's refusal to allow cross-examination into topic, where there was a wide-ranging cross-examination providing jury sufficient information to assess witness as well as abundant other evidence reflecting on the issue).

{¶48} Next, Moore's counsel then attempted to introduce the entire police report into evidence, citing hearsay exceptions pursuant to Evid.R. 803(6) and 803(8). However, even if one or more of the exceptions applied to the police report generally, Moore was attempting to admit statements within its contents that he failed to show either were admissible under a hearsay exception or did not constitute hearsay. *See Petti v. Perna*, 86 Ohio App.3d 508, 513-514 (3d Dist. 1993) (for the Evid.R. 803(8) exception to apply, "[t]he observations must be either the firsthand observations of the official making the report or those of one with a duty to report to a public official"). When the trial court pointed out the double-hearsay issue, Moore's counsel complained there was "[a] lot of hiding evidence from the jury"

but did not address the admissibility challenges created by the evidence rules. (Trial Tr. at 290). We find no abuse of discretion. *Settles*, 1998 WL 667635, at *6 (3d Dist.) (trial court erred in allowing detective's testimony about contents of his police report because it contained hearsay statements of witnesses who had no official duty to give statements to the police).

{¶49} Finally, Moore argues the trial court erred by sustaining a hearsay objection when his counsel posed this question to T.G.'s mother: did Officer Jagger ever ask you who T.G.'s pediatrician was from 2014 to 2016? Moore claims that questions cannot be hearsay because they are not statements and not offered to prove facts. Arguably, there is conflicting case law on this point, but we need not delve into it to address the argument here. *E.g.*, *In re M.H.*, 2021-Ohio-1041, ¶ 56 (1st Dist.) (questions "are not assertions, and therefore not statements, because they are incapable of being proven either true or false"); *State v. Ecklin*, 1995 WL 407309, *6 (11th Dist. June 9, 1995) ("a question can be an assertion and, therefore, hearsay"). Even if the question posed by Moore's counsel did not seek to elicit hearsay, any error in sustaining the hearsay objection was harmless beyond a reasonable doubt. Once again, the testimony to be elicited concerned a relatively peripheral issue in the case and Moore's counsel explored, at length, the process of Officer Jagger's investigation and critiqued it. This included asking Officer Jagger both if she had requested and if she had ever received medical records from T.G.'s pediatrician (Officer Jagger admitted she had not). Based on our review of the

record, the trial court's decision to sustain the State's hearsay objection did not affect the trial's outcome. *See also U.S. v. Disla*, 358 Fed.Appx. 121, 132-134 (11th Cir. 2009).[5]

{¶50} Moore's third and sixth assignments of error are overruled.

### E.  Ninth Assignment of Error

{¶51} The ninth assignment of error also addresses an evidentiary issue. In response to defense counsel's questioning, T.G. admitted that she became frustrated at the people on Moore's side of the family because they weren't communicating with her, including a cousin. When Moore's counsel asked, "did you at some point send [the cousin] a Facebook message expressing that frustration that no one -- ," the prosecutor cut off the rest of the question with a hearsay objection. (Trial Tr. at 575). Defense counsel argued the solicited testimony was not being offered for the truth of the matter asserted in the statement, but was being offered to show bias and motive. The court sustained the objection and defense counsel, rather than reframing the question, abandoned the inquiry and ended his examination of T.G.

---

[5] As a final matter, within the assignment of error, Moore offhandedly directs us to a portion of the cross-examination of T.G.'s half-sister. (*See* Appellant's Brief at 19). His counsel sought to show the half-sister was testifying inconsistently from the first trial regarding when she told T.G.'s mother about Moore having sex with T.G. On appeal, Moore complains that the State dictated the method of impeachment that had to be used. (*Id.*). However, the trial court did not impose any requirements on Moore's counsel to use a specific method of cross-examination, and we find no abuse of discretion in the court sustaining the objection challenging the improper impeachment. Looking at the transcript, it is evident that during a sidebar the prosecutor—in an apparent attempt to help defense counsel and move the cross-examination forward—described a way to impeach a witness through the use of a prior inconsistent statement. Moore's counsel then was able to have T.G.'s half-sister acknowledge her testimony differed from her prior testimony, she referenced the difference, and she tried to explain the difference.

{¶52} We find no abuse of discretion. It is questionable whether Moore was not offering the statement to prove the truth of the matter asserted, but instead to show bias and motive. *See State v. Issa*, 1998 WL 80301, *3 (1st Dist. Feb. 27, 1998) (no abuse of discretion in excluding out-of-court statement where defendant argued it was admissible to show bias, where such a contention was questionable); *State v. King*, 2019-Ohio-833, ¶ 15-20 (12th Dist.). Hindering his contention, there is no indication the lack of communication with Moore's side of the family or the statement were made prior to the police investigation or even prior to Moore being indicted. Furthermore, even if sustaining the objection was erroneous, we conclude that any error was harmless. *Issa* at *3.

{¶53} Moore's ninth assignment of error is overruled.

### F. Fourth Assignment of Error

{¶54} The fourth assignment of error concerns two different issues involving alleged expert testimony by witnesses not disclosed as experts. First, Moore complains that the State "offered evidence that [Moore] treated [T.G.] differently than the two other children in the home, to wit: favoring her with his attentions while not paying attention to the two others." (Appellant's Brief at 20). He cites testimony from T.G.'s mother and T.G.'s half-sister, as well as his objection that the State was (allegedly) presenting grooming evidence when no expert had been

disclosed.[6]  The trial court overruled the objection on the ground that the witnesses were testifying to their personal observations about what was happening in their home, not providing expert testimony.

{¶55} Second, Moore points to Special Agent Walter's testimony that, based on his experience investigating these types of sex cases, it is not uncommon for victims to delay reporting instances of sexual abuse.  Special Agent Walter was not disclosed as an expert witness, and Moore objected that such testimony was expert testimony.  The trial court overruled the objection as permissible lay witness testimony, pursuant to Evid.R. 701, not expert testimony.

### 1.      Standard of Review

{¶56} An appellate court reviews a trial court's admission or exclusion of evidence for an abuse of discretion.  *State v. Finnerty*, 45 Ohio St.3d 104, 107 (1989).  Additionally, an abuse of discretion standard applies to a trial court's decision to admit testimony under Evid.R. 701.  *State v. Cook*, 2020-Ohio-3411, ¶ 39 (3d Dist.).  As noted earlier, a trial court abuses its discretion when its conduct is unreasonable, arbitrary, or unconscionable.  *Hill*, 2022-Ohio-4544, at ¶ 9.

---

[6] The Supreme Court of Ohio approvingly cited the following definition of "grooming": "Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity."  *State v. Williams*, 2012-Ohio-5695, ¶ 21, quoting *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011); *see also* 2024 Sub. H.B. No. 322 (enacting R.C. 2907.071 to create the offense of "grooming," which generally involves engaging in a pattern of conduct with a minor for the purpose of preparing the minor to engage in sexual activity).  While it is questionable whether the favoritism here qualifies as "grooming," we need not decide whether it does in order to address Moore's assignments of errors.

### 2. Analysis

**{¶57}** Looking at the first issue, we agree with the trial court's ruling that the testimony from T.G.'s mother and half-sister concerned their personal observations. It was not testimony that required them to be qualified as an expert witness and, therefore, was not objectionable on that basis. *See* Evid.R. 702.

**{¶58}** Turning to the second issue, Special Agent Walter testified at length about his extensive qualifications, training, and experience in law enforcement and investigating sexual assault cases. This included his experience as a sexual assault detective for the Marion Police Department and as a special agent for the Naval Criminal Investigative Service handling numerous sexual assault investigations. Without objection, Special Agent Walter testified he was familiar with instances of individuals who delay reporting sexual assault and reasons why victims do not immediately report having been sexually assaulted. Then, when the prosecutor asked if delayed reporting of sexual assault was common in his experience, Moore's counsel objected. After the trial court overruled the objection, Special Agent Walter answered "yes" to the question.

**{¶59}** The evidence rule governing opinion testimony by lay witnesses provides, "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

Evid.R. 701.  In assessing admissibility under this rule, the Supreme Court of Ohio has "recognize[d] the importance of a foundation of sufficient familiarity with the substance to support the opinion."  *State v. McKee*, 91 Ohio St.3d 292, 295-296, 2001-Ohio-41 (2001).  In other words, in considering the lay witness opinion testimony, the trial court must make "an initial determination that the witness possessed sufficient experience or specialized knowledge, thus satisfying the rule's requirements that the opinion be both 'helpful to a clear understanding . . . of a fact in issue' and 'rationally based' upon the witness's perception."  *Id.* at 296.  In accordance with this application of the rule, "courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702."  *Id.*

{¶60} Having reviewed the transcript, we find that the trial court did not abuse its discretion in admitting Special Agent Walter's testimony at issue pursuant to Evid.R. 701.  He provided sufficient foundation detailing his experience and knowledge to support the testimony.  *See McKee* at 297-298.  His testimony concerning whether, in his experience, it is common for individuals to delay reporting instances of sexual abuse was based on his own perceptions and experience, and it was helpful to the jury in the determination of a fact in issue. Evid.R. 701; *State v. Jones*, 2015-Ohio-4116, ¶ 104-111 (2d Dist.) (trial court did not abuse its discretion in allowing lay witness detective's testimony that it is common for children to delay in reporting sexual abuse, where Evid.R. 701's

requirements were met); *State v. Bright*, 2024-Ohio-2803, ¶ 18-25 (8th Dist.) (nurse's testimony offering opinion as to how, when, and why a child sexual-assault victim may or may not disclose the assault was permissible lay-witness testimony because the State laid a foundation demonstrating her qualifications and her testimony was based on her personal knowledge and experience). For example, the testimony was helpful to the jury in assessing T.G.'s credibility in relation to her delayed reporting and in understanding the investigative process in general, both of which Moore attacked during trial. *Jones* at ¶ 111 (finding the detective's "testimony was rationally based on his training and personal experience in child abuse cases, and aided the trier of fact in determining [the victim's] credibility since her disclosure of the abuse was delayed and she had some difficulty with the timing of her abuse"). We also emphasize that the testimony at issue was general in nature, not pertaining to T.G. specifically. *Bright* at ¶ 23-25.

{¶61} Accordingly, Moore's reliance on Crim.R. 16(K)—and its requirements that an expert witness prepare a written report summarizing the expert's testimony and disclose that report no later than 21 days before trial—is misplaced. *Bright* at ¶ 25 (because the nurse's testimony was properly admitted pursuant to Evid.R. 701, "Crim.R. 16(K) was not violated").

{¶62} Moore's fourth assignment of error is overruled.

### G.     Fifth Assignment of Error

**{¶63}** In the fifth assignment of error, Moore argues that the trial court erred by allowing evidence of prior bad acts without the State requesting permission to present such evidence prior to trial, as required by Evid.R. 404(B).  Once again, Moore focuses his argument on two different sets of evidence that we address separately.

**{¶64}** The first set is the favoritism evidence we analyzed in the fourth assignment of error.  Specifically, Moore cites testimony from T.G.'s mother that she noticed all three girls would want to go to the store with Moore but T.G. was the only one allowed to go, T.G. would be the only one allowed to take motorcycle rides with Moore, and T.G. "got a little more spent on her" for Christmas.  (Trial Tr. at 326, 331).  Moore argues that the trial court was under the mistaken impression that the objected-to testimony must concern an act that was illegal or evil.

**{¶65}** The second set is T.G.'s testimony concerning Moore's use of the dildo, use of the anal beads, and touching prior to having intercourse (i.e., kissing T.G., touching her breasts, putting his hand in her pants, and touching her vagina).  Moore argues that, in overruling his objection, the trial court erred because the evidence was never disclosed pursuant to the notice requirements in Evid.R. 404(B)(2)(a), (b), and (c).

### 1.    Applicable Law and Standards of Review

**{¶66}** "Evid.R. 404(B) does not contain a blanket prohibition on the introduction of other-acts evidence." *State v. Echols*, 2024-Ohio-5088, ¶ 30. Instead, it "broadly prohibits the use of '[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.'" *Id.* at ¶ 24, quoting Evid.R. 404(B)(1). The rule goes on to reference permitted uses of other crimes, wrongs, or acts, and it contains a notice requirement:

> (2) *Permitted Uses; Notice.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The proponent of evidence to be offered under this rule shall:
>
> > (a) provide reasonable notice of any such evidence the proponent intends to introduce at trial so that an opposing party may have a fair opportunity to meet it;
> >
> > (b) articulate in the notice the permitted purpose for which the proponent intends to offer the evidence, and the reasoning that supports the purpose; and
> >
> > (c) do so in writing in advance of trial, or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Evid.R. 404(B)(2). "Though Evid.R. 404(B) lists specific examples of permissible nonpropensity purposes for which other-act evidence may be admitted, its list is not exhaustive." *Echols* at ¶ 31. "The key [to admissibility] is that the evidence must prove something other than the defendant's disposition to commit certain acts."

*State v. Hartman*, 2020-Ohio-4440, ¶ 22 ("evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue").

**{¶67}** Not all evidence implicates Evid.R. 404(B). By its "own terms, evidence must meet two criteria to fall within its scope." *Echols* at ¶ 24. First, it must be evidence of a "crime, wrong, or act." *Id.* Second, "it must not be evidence that goes directly to the charged crime itself—rather, it must be evidence of an '*other* crime, wrong or act.'" (Emphasis in original.) *Id.*, quoting Evid.R. 404(B)(1).

**{¶68}** In considering other-acts evidence, "trial courts should conduct a three-step analysis." *State v. Williams*, 2012-Ohio-5695, ¶ 19. "The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20, citing Evid.R. 401. The second step "is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* "[C]ourts must scrutinize the proponent's logic to determine exactly how the evidence connects to a proper purpose without relying on any intermediate improper-character inferences." *Hartman* at ¶ 23.

**{¶69}** "The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Williams* at ¶ 20, citing Evid.R 403. Given that the evidence rules do not bar all

prejudicial evidence but only that which is unfairly prejudicial, "the primary concern is that the evidence creates an undue tendency to lead the factfinder to find guilt based on an impermissible character-based inference." *Echols*, 2024-Ohio-5088, at ¶ 41. Such evidence must be excluded when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Hartman*, 2020-Ohio-4440, at ¶ 29, citing Evid.R. 403(A).

{¶70} Under Evid.R. 404(B), "[t]he determination of whether other-acts evidence is admitted for a permissible purpose is a question of law, which we review de novo." *Echols*, 2024-Ohio-5088, at ¶ 30, citing *Hartman*, 2020-Ohio-4440, at ¶ 22. However, the portion of our analysis regarding whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury is reviewed for an abuse of discretion. *Id.* at ¶ 39, citing *Hartman* at ¶ 30.

### 2. Analysis

{¶71} We start by addressing the testimony that, around the time the alleged sexual acts began, witnesses noticed Moore exhibiting favoritism to T.G. over her half-sisters. Even assuming this testimony falls within the scope of other-acts evidence subject to Evid.R. 404(B), the testimony was not admitted "to prove [Moore's] character in order to show that on a particular occasion [Moore] acted in accordance with the character." Evid.R. 404(B)(1). The testimony at issue explained the sequence of events leading up to the charged offenses and preparation

-37-

for committing them, as well as the delay in reporting them. Evid.R. 404(B)(2); *see also State v. Plevyak*, 2014-Ohio-2889, ¶ 26, 29 (11th Dist.); *State v. Pridgett*, 2016-Ohio-687, ¶ 29-33 (8th Dist.).

**{¶72}** Moore emphasized T.G.'s delay in disclosing the conduct, and the jury could find this testimony helped to explain the sequence of events and why T.G. may not have immediately reported the conduct of someone close to her who was showing her favoritism. *See State v. Schwarzman*, 2014-Ohio-2393, ¶ 31-33 (8th Dist.) (in countering defendant's credibility attacks on victim due to delayed disclosure, explaining the jury could have relied on testimony concerning the favoritism defendant showed to victim).

**{¶73}** Looking to the three-part test for admission of the other-acts evidence, the testimony was relevant. Evid.R. 401; *e.g., State v. Granakis*, 2017-Ohio-8428, ¶ 23-24 (9th Dist.) (witness testimony as to observations regarding how defendant and victim interacted, including showing favoritism, was admissible to help the trier of fact understand the charge and defendant's course of conduct). Next, we do not find that the State presented the testimony concerning favoritism to prove Moore's character "in order to show activity in conformity therewith." *Williams*, 2012-Ohio-5695, at ¶ 20. Instead, as shown in the preceding paragraph, the other acts evidence was presented for separate, legitimate purposes to "prove something other than [Moore's] disposition to commit certain acts." *Hartman*, 2020-Ohio-4440, at ¶ 22; *see also Williams*, 2012-Ohio-5695, at ¶ 23; *Pridgett*, 2016-Ohio-687, at ¶ 29-33

-38-

(8th Dist.) (witness's testimony concerning defendant's apparent attempted flattery of her was relevant to demonstrate his preparation and intent, not used as character evidence).

{¶74} Turning to the third step, the evidence's probative value for permitted purposes was not substantially outweighed by the danger of unfairly prejudicing Moore or confusing or misleading the jury. The evidence did not have "an undue tendency to lead" the jury to find him guilty of the charged offenses because he exhibited favoritism. *Echols*, 2024-Ohio-5088, at ¶ 41. Therefore, the testimony passed the three-step analysis for admissibility.

{¶75} Finally, Moore's primary argument is that the State did not provide the notice required by Evid.R. 404(B)(2), set forth above. Even if we assume the testimony concerning favoritism qualifies as other-acts evidence subject to Evid.R. 404(B), we note that Moore does not argue he was surprised the State introduced the evidence at trial or was unprepared for it. *See* 2012 Staff Note, Evid.R. 404 ("The purpose of adding the notice requirement is to provide the prosecution and the defense with the opportunity to prepare their case"). In fact, the trial transcript indicates Moore expected the testimony and was prepared for it by arguing it was not relevant to the State's case. (Trial Tr. at 326-327). Moreover, "[t]he rule should not be construed to exclude otherwise relevant and admissible evidence solely because of a lack of notice, absent a showing of bad faith." 2012 Staff Note, Evid.R. 404. A prosecutor acts in bad faith by withholding notice of the other-acts evidence

in order to gain a tactical advantage at trial. *Plevyak*, 2014-Ohio-2889, at ¶ 21-22 (11th Dist.). Moore does not show—or even argue—any bad faith on the part of the prosecution in introducing such evidence here. *Id.*; *see also State v. Nuzum*, 2016-Ohio-2744, ¶ 21 (6th Dist.). Based on the circumstances, Evid.R. 404(B)'s notice requirement would not require the first set of evidence at issue to be excluded.

{¶76} The second set of evidence (Moore's use of sex toys and sexual contact) was not evidence of other crimes, wrongs, or acts. As shown above, it was direct testimonial evidence of some of the charged offenses. First, T.G.'s testimony concerning Moore's use of the dildo on her was evidence of the GSI offense in Count 13. Second, T.G.'s testimony concerning Moore's use of the anal beads on her the next day was evidence of the rape offense in Count 3. Third, T.G.'s testimony that Moore would kiss her, touch her breasts, put his hand in her pants, and touch her vagina prior to having sexual intercourse with her was evidence of the GSI offenses in Counts 11, 12, and 15. Thus, the testimony went directly to the charged crimes themselves, so it does not fall within the scope of Evid.R. 404(B) and its notice requirement does not apply. *Echols*, 2024-Ohio-5088, at ¶ 24 (the evidence "must not be evidence that goes directly to the charged crime itself— rather, it must be evidence of an '*other* crime, wrong or act'" [emphasis in original]), quoting Evid.R. 404(B)(1).

{¶77} Moore's fifth assignment of error is overruled.

### H. Tenth Assignment of Error

{¶78} In the tenth assignment of error, Moore contends that the trial court erred in not requiring the State to play the entire video of Moore's interview with Special Agent Walter. Instead, the State introduced only four clips from the interview. Moore asserts that, at trial, he "attempted to offer the video as a business record, as a public record, . . . and pursuant to the Rule of Completeness under Evid.R. 106." (Appellant's Brief at 35). Based on a review of the transcript, it appears Moore did not actually attempt to offer the video as evidence. Rather, Moore attempted to force the State to play the entire video in order to have his statements to Special Agent Walter that were recorded on the video introduced to the jury without his having to personally testify.

#### 1. Standard of Review

{¶79} Once again, an appellate court reviews a trial court's admission or exclusion of evidence for an abuse of discretion. *Finnerty*, 45 Ohio St.3d at 107. This standard of review applies to a trial court's decision on whether to admit other parts of a writing or recorded statement under Evid.R. 106. *State v. Singh*, 2022-Ohio-3385, ¶ 31, 35 (12th Dist.); *State v. Mathers*, 2008-Ohio-2902, ¶ 25-26 (9th Dist.).

#### 2. Applicable Law

{¶80} Evid.R. 106, commonly known as the "rule of completeness," provides that, "[w]hen a writing or recorded statement or part thereof is introduced

by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement *which is otherwise admissible* and which ought in fairness to be considered contemporaneously with it." (Emphasis added.) Evid.R. 106. Therefore, when a party only introduces a part of a written or recorded statement, the adverse party cannot automatically require the introduction of another part—or the remainder—of it. *Id.*; *see also Singh* at ¶ 33. The adverse party has the burden of showing the additional part sought to be introduced is "otherwise admissible." *Singh* at ¶ 33. The main purpose of the rule of completeness is to prevent one party from taking statements out of context and distorting them. *Id.* at ¶ 32; *Mathers* at ¶ 27 (the rule "allows the adverse party to immediately put the admitted statements into context by permitting the party to simultaneously admit the remainder of the writing or recording").

### 3. Analysis

{¶81} Moore did not meet his burden of showing that the remaining part of the videotaped police interview was "otherwise admissible." Initially, we address Moore's reliance on the fact that the entire video (with the exception of Moore mentioning he was willing to take a polygraph) was admitted into evidence at the *first* trial. Moore contends the admission of the full video at his first trial (which was open to the public) allowed him to "offer the video as a business record, as a public record . . . and pursuant to the Rule of Completeness under Evid.R. 106" and required the State play the entire video during its questioning of Special Agent

Walter. (Appellant's Brief at 35). Moore's logic is incorrect. The State was free to present its case at the second trial in the manner it deemed appropriate under the Rules of Evidence. Moore has failed to show that the stipulated admission of the video during the first trial is relevant to the issue here or would require admission of the entire video during the second trial. *E.g. State v. Gau*, 2010-Ohio-5516, ¶ 21 (11th Dist.) (the actions and proceedings raised by appellant "occurred in the context of the first trial and were therefore irrelevant to the second trial").

**{¶82}** More basically, Moore simply has not shown that any other portion of the video was "otherwise admissible," pursuant to Evid.R. 106. During trial, the State explained the various admissibility issues with the other portions of the video, including hearsay, rape shield protections, and relevancy. Yet, apart from his claim that the entire video was both a public record and a business record, Moore fails to address any of these issues or otherwise affirmatively show why any other portion of the video was admissible.

**{¶83}** Concerning his bald assertion that the entire video was a public record, Moore does not support this proposition with any reasoning or cited authority. Looking back to the trial transcript, it appears Moore's argument during the trial was that, once the video was admitted into evidence in the first trial, it became public property and a public record. However, the situation does not fit the requirements of the public records exception to hearsay, so we reject this argument and we likewise do not find any other exception applies. *See* Evid.R. 803(6); *Singh*, 2022-

-43-

Ohio-3385, at ¶ 36 (12th Dist.) (defendant's statements on other parts of the videotaped interview "were not 'otherwise admissible' as they are exculpatory statements that do not fall within an exception to the general rule excluding hearsay statements from evidence"); *Mathers*, 2008-Ohio-2902, at ¶ 29-30 (9th Dist.) (trial court's denial of request to introduce entire recording of defendant's police interview was not abuse of discretion; defendant "could not use Evid.R. 106 to offer his own out of court statement"). The trial court did not abuse its discretion in denying Moore's request to play the entire video of the interview during the trial.

**{¶84}** Moore's tenth assignment of error is overruled.

## I.       Second Assignment of Error

**{¶85}** In the second assignment of error, Moore argues the trial court erred when it convicted him for sexual battery despite the Third Amended Bill of Particulars erroneously alleging Moore was T.G.'s stepparent. However, the trial court at sentencing found that each rape count merged with the sexual battery count from the same time period. Thus, contrary to Moore's claim, he actually was *not convicted* of sexual battery. *E.g., State v. Radabaugh*, 2024-Ohio-5640, ¶ 22 (3d Dist.), citing R.C. 2941.25(A) (although the jury found defendant guilty of two counts, the trial court merged them at sentencing, so he was only convicted and sentenced on one of the counts). Consequently, Moore does not have a final conviction for sexual battery to be vacated. *E.g., State v. Marks*, 2024-Ohio-4863, ¶ 32, fn. 1 (3d Dist.); *State v. Williams*, 2012-Ohio-4693, ¶ 71 (4th Dist.) (because

the count was merged, defendant was not convicted for the count, so there was no conviction to vacate and any error related to an issue concerning that count was harmless); *State v. Price*, 2019-Ohio-3201, ¶ 11, fn. 2 (2d Dist.) (declining to address assignments of error relating to offense merged at sentencing). Because we affirm Moore's convictions and sentence, we need not and do not address this assignment of error. *E.g.*, *State v. Carter*, 2022-Ohio-1444, ¶ 48, fn. 7 (3d Dist.) ("*if* we reversed the rape convictions for any reason, the kidnapping [charge that was merged at sentencing] could be reinstated assuming the charge was still supported by the evidence" [emphasis added.]).

{¶86} Moore's second assignment of error is overruled.

### J. Cumulative Error Analysis

{¶87} Finally, although Moore does not specifically assign such an alleged error, he also presents the argument that the errors committed by the trial court were not harmless. Given that we found the possibility of harmless errors in our analysis above, we consider the cumulative-error doctrine. Pursuant to the doctrine, "[a]lthough violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. Here, even considering all of the possible harmless errors indicated above, Moore's argument concerning errors fails because, when considered cumulatively, they did

not result in prejudicial error or otherwise deprive him of the right to a fair trial. *State v. Powell*, 2012-Ohio-2577, ¶ 224; *DeMarco*, 31 Ohio St.3d at 196-197.

## IV. CONCLUSION

**{¶88}** For the foregoing reasons, Moore's assignments of error are overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Marion County Court of Common Pleas.

*Judgment Affirmed*

**WALDICK, P.J. and WILLAMOWSKI, J., concur.**

**/jlm**