[Cite as *State v. Venters*, 2025-Ohio-3111.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

STATE OF OHIO,                                    :

    Appellee,                                   :          CASE NO. CA2024-10-064

    - vs -                                           :          <u>OPINION AND</u>
                                                          <u>JUDGMENT ENTRY</u>
                                               :          9/2/2025

AARON J. VENTERS,                           :

    Appellant.                                  :


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 23CR41180


David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Johnna M. Shia, for appellant.


# **O P I N I O N**


**HENDRICKSON, P.J.**

{¶ 1}   Appellant, Aaron J. Venters, appeals from his conviction and sentence in the Warren County Court of Common Pleas for gross sexual imposition. For the reasons discussed below, we affirm his conviction and sentence.

{¶ 2} On November 20, 2023, appellant was indicted on one count of gross sexual imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree, one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, and one count of sexual battery in violation of R.C. 2907.03(A)(5), a felony of the third degree. The charges arose out of an incident that occurred at appellant's home in Franklin, Warren County, Ohio on February 27, 2023, involving appellant's 13-year-old stepdaughter, Britney.[1] On that date, appellant was alleged to have grabbed Britney's legs, rubbed his hands up and down her legs, including her upper thighs, and reached under Britney's shorts and underwear to touch her pubic area and place his thumb between the lips of her vagina.

{¶ 3} Appellant pled not guilty to the charges and a two-day jury trial commenced on July 22, 2024. At trial, the State presented testimony from Britney, Britney's half-sister Tiffany, Tiffany's aunt, Aunt J., and Franklin Police Detective Amanda Myers. Appellant called Britney's mother (hereafter "Mother") and Britney's sister, Lisa, as defense witnesses. Both the State and the defense presented as evidence text messages that had been exchanged between the various family members on the date of the incident and the months that followed. These messages included texts exchanged by Britney and Mother, Britney and Lisa, Britney and Tiffany, Tiffany and Lisa, and messages from Britney to "Rick," a family friend. From the testimony and exhibits introduced into evidence, the following facts were established.

{¶ 4} Britney has two full siblings, Lisa and Ian, and a half-sibling, Tiffany. Prior to Mother marrying appellant, all four siblings lived with Mother in Middletown, Ohio. Mother

---

1. To protect the victim's privacy and for purposes of readability, pseudonyms have been used to refer to the victim, the victim's siblings, and one of the sibling's paternal aunts. *See State v. Napier*, 2024-Ohio-1837, ¶ 3, fn. 1 (12th Dist.); *In re A.P.*, 2022-Ohio-3181, ¶ 2, fn. 1 (12th Dist.). *See also* Ohio Const., art. I, § 10a(A)(1) (requiring that victims in the criminal and juvenile justice systems "be treated with fairness and respect for the victim's safety, dignity and privacy").

- 2 -

was a self-described "party mom," who often left the children home alone unsupervised while she was out drinking at night. After she met appellant, Mother claimed her behavior changed. She testified she got sober and started being stricter with the children. She married appellant and she and the children went to live with appellant in his home in Franklin, Ohio.

{¶ 5} By February 2023, only Britney remained living with appellant and Mother. Mother's other children had gone to live with various family members. Appellant had a son who would stay over at appellant's home on weekends.

{¶ 6} On February 27, 2023, thirteen-year-old Britney arrived home to an empty house after finishing an eighth-grade school day. Britney explained that she typically got home from school around 3:00 p.m., and that appellant would come home from work about 10 to 15 minutes later. Mother worked evening shifts at her job, until 10:30 or 11:00 p.m.

{¶ 7} When Britney got home on February 27, 2023, she went into her bedroom to play video games. Appellant came home and entered her bedroom, holding a jar of moonshine that he was drinking. After talking to Britney about the moonshine, he left and she continued playing video games. Later that evening, Britney took a shower and got dressed in "very loose . . . very big" basketball shorts, a big T-shirt that hung below her hips, underwear, and a bra. Appellant had urged her to hurry up and get dressed because he had ordered a pizza and he did not want her to give the pizza man "a show."

{¶ 8} After Britney got dressed, appellant came inside her bedroom to tell her the room was dirty. As Britney started to clean her bedroom, appellant began talking to her about how he previously had cancer and had to have his testicles removed. He also asked her if one of his shirts, which was hanging in her closet, had her "boob juices" on it. The pizza arrived, and Britney went into the kitchen to eat. Appellant followed Britney, asking

her if she "could handle the moonshine that he was drinking." He said, "I bet you can't handle it" and offered her the jar. Britney declined the offer and went back into her bedroom to continue cleaning. Appellant once again followed her, continuing to talk about having cancer and the removal of his testicles. Britney testified the conversation was "awkward" since she and appellant never talked to one another. Britney left her room and went into the living room, sitting down on the sectional. Appellant followed her into the living room and sat in his recliner next to the sectional.

{¶ 9} Appellant continued to engage in awkward conversation, telling Britney about how he had to explain to his mother a picture taken of him "holding a stripper's boobs." He then offered to sign a paper from the school that Britney had received after getting into trouble for vaping and marijuana use. Britney testified that by that point in time, appellant had already drunk about one-half of the jar of moonshine. Britney took a picture of appellant drinking with her cellphone to send a "Snapchat streaks" photograph. She then made a joke about appellant, which prompted him to get up out of his recliner and move to the sectional, on the right side of her.

{¶ 10} As Britney sat with her back against the sectional's armrest, appellant grabbed her legs and put them over his lap, holding Britney's legs with his right arm. Appellant started rubbing her legs with his left hand, moving his hand inside her shorts and commenting about how her legs were "prickly at the bottom but smooth at the top." Britney reacted by moving, bringing her legs up and hugging her knees to her chest. Appellant put his head between her legs and said, "Don't smash me." He then continued to tell her how smooth her legs were at the top. Appellant pulled Britney's legs back down and, with his right arm, held her legs down. Britney testified appellant was holding them "tighter" than before. Once again appellant started rubbing her legs with his left hand, but this time he went further up her shorts, reaching under her underwear and touching her

- 4 -

vagina. Britney testified appellant cupped her pubic area with his fingers, with his thumb going between the lips of her vagina. Appellant did not squeeze his hand, and his thumb "did not go in" her vagina.

{¶ 11} While appellant was cupping her vagina, appellant told Britney, "Don't worry, I won't hurt you." Britney testified appellant's actions made her "scared and [she] didn't know what to do." She stated she tried to pull away but was not able to "at first." However, she was eventually able to move away from appellant. Britney pushed her legs away from appellant's arm and he let go, removing his thumb from the lips of her vagina and his hand out from beneath her shorts.

{¶ 12} Britney ran outside to the back patio and tried calling Mother. Mother did not answer so Britney sent a text message that it was an emergency. She texted Mother, "Mom I gotta tty [talk to you] when [yo]u get home" and informed Mother that appellant was doing something that made her "uncomfy." She told Mother, "I'm [a]bout to cry." Britney testified that Mother ended up calling her, and she told Mother "all that [appellant] was doing [that] night." She mentioned "he was drunk and being weird and put hands up my pants." Mother's response was, "I promise he didn't mean nothing. [I] swear [B.G.] had done worst [sic] to me and he is my real father!!" Britney explained Mother had been referring to B.G.'s sexual abuse of Mother, his biological daughter.

{¶ 13} Via text message, Mother acknowledged that on February 27, 2023, appellant had "drank a lot, he admitted it." Mother advised Britney to go in her bedroom and "stay out of [appellant's] way and leave him alone." She texted, "just stay in there" and "[p]retend your [sic] asleep."

{¶ 14} When Britney went into her bedroom, appellant followed her. He only left the room after realizing Britney was on the phone with Mother, acting as if he had entered the bedroom to retrieve the family's puppy. Appellant went to his own bedroom, where he

remained for the remainder of the evening.

{¶ 15} At the same time Britney was sending text messages to Mother, she was also sending messages to her older sister Lisa, then 17 years old, and to a family friend, Rick, to ask for help. To Rick, she texted, "Can [you] please come get me. Mom's at work and [appellant's] being weird. Please. . . . I'm scared." She sent similar messages to Lisa, stating, "[Lisa] please come over here. Please. [Appellant's] being weird. . . . He's drunk and he was tryna touch all on me earlier. . . . And he keeps coming in here and laying in my bed. . . . He was putting his hands up my pants . . . . And he kept putting my legs over his legs and rubbing on my thighs." Lisa responded to the texts by stating that Britney should go in her room, lock it and sit in front of the door. Lisa then stated appellant "prolly [sic] thought you were mom" and that she was "just as scared as [yo]u are." Lisa advised Britney to call Rick and tell him what was going on so that he could come get her. Lisa then advised "Moms [sic] on her way. Sit tight." Neither Lisa nor Rick came to Britney's aid that evening.

{¶ 16} Eventually, Mother came home from work. She addressed appellant's behavior by asking him why it was okay for him to get drunk around Britney when Mother was not permitted to get drunk around his son. Later that evening, Mother said something to appellant in front of Britney about his behavior towards her and appellant apologized to Britney.

{¶ 17} Mother did not want Britney talking about appellant's actions with others, and she made Britney delete the text messages she had sent to Mother, Rick, and Lisa about the incident. Britney did so, but only after she had taken screenshots of the messages. Though she did not send Lisa any more messages about the event that day, she spoke with Lisa in person about appellant's actions. Despite the fact that both Mother and Lisa had been informed of the sexual abuse, neither contacted the police. Britney

- 6 -

testified she did not go to the police because Mother would have been "very angry with [her] if [she] told anybody anything."

{¶ 18} In the days that followed, Lisa told her and Britney's half-sister, Tiffany, about what had occurred between appellant and Britney. Tiffany lived with her paternal aunt, Aunt J., in Columbus, Ohio. Tiffany reached out to Britney and the two exchanged text messages with one another about the incident. Britney informed Tiffany that appellant had gotten drunk, tried to get her to drink with him, followed her around the house "talkin[g] [a]bout boobs and how he has no balls," grabbed her legs and put them over his, and talked about how her legs were "prickly down [t]here" and "smooth up" on her thigh before sticking his hands up her shorts and putting his hands on her "cooch." Britney texted Tiffany that appellant told her, "don't be scared I won't hurt you" when touching her. Britney explained to Tiffany that she had called Mother to inform her about appellant's actions but Mother "didn't even wanna come home" and "barely even yelled" at appellant. Britney also told Tiffany that Mother "won't let me talk to anybody about it."

{¶ 19} Britney and Tiffany ended up talking to one another on the phone about appellant's actions. When Britney spoke about the incident, Tiffany noticed Britney's demeanor changed. Britney became upset and started crying. Following the phone call with Britney, Tiffany spoke with Aunt J. about appellant's actions.

{¶ 20} After Aunt J. learned of the incident, Aunt J. and Tiffany drove to the Franklin Police Department to report appellant's sexual abuse of Britney. That night, the police, along with Children Services, went to appellant's home and removed Britney from Mother's and appellant's care. Aunt J. took custody of Britney. Britney testified she felt "relieved" when she was removed from Mother's care and home as she had not "fe[lt] safe" and Mother "was not very, a very good mom."

{¶ 21} On March 27, 2023, Britney was interviewed at the Child Advocacy Center

by a trained forensic interviewer. Following that interview, Britney turned her cellphone over to law enforcement, who conducted a forensic analysis of the device. Text messages that were recovered from Britney's cellphone from February 27, 2023 to March 27, 2023 were admitted into evidence.

{¶ 22} While Britney was living with Aunt J., Mother sent text messages to Britney telling her that "all you do is lie, lie, lie." Lisa accused Britney of being "mentally ill." Both Mother and Lisa pushed Britney to recant the sexual abuse allegations she made against appellant, asking Britney to claim that she "made it all up and nothing ever happened." Tiffany testified she saw various text messages sent by Lisa and Mother asking Britney to say that she lied about the sexual abuse. However, those messages were later deleted.

{¶ 23} At one point, Britney sent the following text message to Lisa:

> Okay so what do u say? do i just go "mom please help me, everything i said was a lie, i was just angry with you and [appellant] because i kept getting in trouble and getting yelled at. i didn't know it would get this far. i hate it here, these people are no good here, everytime [sic] i talk about you they try to turn me against you saying you're a piece of shit and they always try to turn me against rick too. they won't ever let me speak for myself, everytime [sic] court comes [Tiffany] and [Aunt J.] speak more than me. every [sic] since i've moved here my mental health has gone bad. [Tiffany] tried countless times to get me to do drugs with her. my education is decreasing, i don't feel happy anymore. [Appellant] never did anything to me mom it was all a lie, im so sorry mom, i regret ever making all this up i let it go too far. i let my anger get the best of me again mom im sorry, please help me. i didn't want to say it sooner because i didn't want everyone to look at me differently so I just let it get worse. it was all i lie i made it all up. i'm sorry."
>
> or do I switch it up

According to Britney, a similar message had been sent to her by Lisa, with instructions to "make it sound more like [you]" before sending it to Mother. Britney testified she sent the

message back to Lisa, asking if the wording of the message is what Lisa wanted her to say or if she should "switch it up" and say something else. However, Britney testified she never ended up sending the message to Mother, because the contents of that text message were a lie.

{¶ 24} On cross-examination, defense counsel questioned Britney about the recanting text message she sent Lisa and questioned Britney's propensity for untruthfulness. Defense counsel elicited testimony that Britney had smoked pot, stolen money, told lies in the past, and had "catfished" others by using a photograph of one of Tiffany's friends and pretending to be someone else online. Britney explained she catfished people using another's photograph because she "did not think [she] was very pretty or loved."

{¶ 25} Mother testified that Britney "constantly lied," explaining that Britney had lied about the catfishing incidents and once lied about a family friend having cancer. Mother testified that Britney had also stolen $600 from a family friend. Mother acknowledged that Britney had learned to steal from her, as she had taught Britney to steal prescription drugs from a family friend during her "party mom" days.

{¶ 26} Mother testified that when Britney communicated with her on February 27, 2023 about the incident with appellant, Britney never mentioned appellant had sexually assaulted her. Rather, Mother claims Britney only complained about appellant drinking. Mother admitted she sent the following text to Britney: "I promise he didn't mean nothing. [I] swear [B.G.] had done worst [sic] to me and he is my real father!! If you have to be mean be mean but honestly I don't think he meant nothing by it." However, Mother denied she sent the text in response to Britney's sexual abuse claims. Rather, Mother testified she sent the message because she thought appellant was "just being drunk and disorderly," behavior she was familiar with because her own father, B.G., would get drunk

and "freak [her] out." Mother denied that she told Britney to recant or take back the sexual abuse accusations she made against appellant. She claimed she never "talk[ed] about any of this with [Britney]."

{¶ 27} Lisa testified that after she received Britney's texts on February 27, 2023 telling her about appellant's actions, she called Mother and told Mother she needed to get home. Initially, she claimed she only told Mother that Britney mentioned being drunk and "weird" and did not relay the sexual abuse allegations. However, she later testified that the incident was "over a year ago. I don't remember anything from that night."

{¶ 28} Lisa testified that Britney was a "pathological liar" who, like their other siblings, did not like appellant because he "straighten[ed] up" Mother's behavior, causing Mother to become a stricter parent. Lisa denied that she ever asked Britney to recant the sexual abuse allegations made against appellant or that she ever sent Britney a text message telling Britney what to say to recant the allegations. Rather, Lisa claims that Britney drafted and sent her a text message recanting on her own. She claims the message was sent a couple days after Britney called her on the phone, crying and saying she "doesn't want to ruin [appellant's] life anymore. And that none of that ever happened."

{¶ 29} After considering the foregoing testimony and evidence, the jury found appellant guilty of gross sexual imposition but not guilty of rape and sexual battery. The trial court ordered a presentence investigative ("PSI") report and set the matter for sentencing. On September 11, 2024, after being read a statement from the victim, hearing from the State, appellant, and defense counsel, reviewing the PSI, and considering relevant sentencing statutes, the trial court imposed an 18-month prison sentence on appellant, designated him a Tier I sex offender, and advised him he was subject to five years of mandatory postrelease control.

{¶ 30} Appellant appealed his conviction and sentence, raising three assignments

of error for review. As the first and second assignments of error are related, we address them together.

{¶ 31} Assignment of Error No. 1:

{¶ 32} [APPELLANT'S] CONVICTION IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 33} Assignment of Error No. 2:

{¶ 34} [APPELLANT'S] CONVICTION IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 35} In his first and second assignments of error appellant argues his conviction for gross sexual imposition was not supported by sufficient evidence and was against the manifest weight of the evidence. Appellant contends Britney was not a credible witness and the weight of the evidence demonstrates she made up the sexual abuse allegations. He further contends that even if Britney's testimony is believed, the State failed to present any evidence that he purposely compelled her to submit to his touch by force or threat of force.

{¶ 36} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 2012-Ohio-3205, ¶ 9 (12th Dist.). Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 37} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire trial record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.). "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, 'these issues are primarily matters for the trier of fact to decide.'" *State v. Barnes*, 2011-Ohio-5226, ¶ 81 (12th Dist.), quoting *State v. Walker*, 2007-Ohio-911, ¶ 26 (12th Dist.). An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id*., citing *Thompkins*, 78 Ohio St.3d at 387.

{¶ 38} Appellant was convicted of gross sexual imposition in violation of former R.C. 2907.05(A)(1), which provided that "[n]o person shall have sexual contact with another, not the spouse of the offender . . . when . . . [t]he offender purposely compels the other person . . . to submit by force or threat of force."[2] "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). "Force" is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or

---

2. Effective August 9, 2024, R.C. 2907.05(A)(1) was modified by the legislature to remove the phrase "not the spouse of the offender." *See* 2023 H.B. No. 161.

thing." R.C. 2901.01(A)(1).

{¶ 39} "'[F]orce need not be overt and physically brutal.'" *State v. Eskridge*, 38 Ohio St.3d 56, 58 (1988), quoting *State v. Fowler*, 27 Ohio App.3d 149, 154 (8th Dist. 1985). The use of "[t]he word 'any' specified in the definition of 'force' recognizes that various crimes upon various victims require different degrees and manners of force." *State v. Umphries*, 2012-Ohio-4711, ¶ 17 (4th Dist.), quoting State *v. Sullivan*, 1993 Ohio App. LEXIS 4859, *10 (8th Dist. Oct. 7, 1993). As it relates to sexual offenses committed against children, the amount of force necessary to commit the offense "depends upon the age, size and strength of the parties and their relation to each other." *Eskridge* at 56, paragraph one of the syllabus. *See also State v. Garrett*, 2009-Ohio-5442, ¶ 60 (12th Dist.); *State v. Moore*, 2025-Ohio-712, ¶ 20-21 (3d Dist.).

{¶ 40} "Courts have found the element of force satisfied when the state presented evidence that the defendant manipulated or moved the victim's body or clothing . . . ." *State v. Fouts*, 2016-Ohio-1104, ¶ 78 (4th Dist.), citing *State v. Burton,* 2007-Ohio-1660 (4th Dist.). In *Fouts,* there was "uncontroverted evidence of force" where the victim testified that the defendant "held his arms around her and pulled down her shirt, moved her hair, and kissed her against her will." *Id.* at ¶ 82. In *Burton*, sufficient evidence of force was found where the defendant "exercised some physical force over the victim by manipulating the victim's clothing and sleeping body into a position that facilitated the sexual conduct. This physical manipulation required force, however minimal, beyond that inherent in the . . . [sexual offense] itself." *Burton* at ¶ 42. In another case, sufficient evidence of force was found where a defendant "took [the victim's] arms in one hand and held them so that she could neither leave nor defend herself . . . [before the] defendant took his free hand and inserted his fingers into her vagina." *In re P.M.*, 2006-Ohio-5917, ¶ 18 (8th Dist.). The "force" element of a gross sexual imposition offense has also been

- 13 -

found sufficient where testimony showed "continuing physical contact when [the victim] moved her legs away on the couch and repeatedly tried to push the Defendant's hands away while he held her thighs when she was in the chair." *State v. Gullickson*, 1997 Ohio App. LEXIS 2031, *7-8 (9th Dist. May 14, 1997).

{¶ 41} In the present case, the State presented testimony establishing all the essential elements of the offense beyond a reasonable doubt, including the contested element of "force." Britney testified she is not appellant's spouse; rather appellant is married to her mother. She further testified that on the evening of February 27, 2023, appellant manipulated her body by grabbing her legs, placing them over his own, and holding them with his right arm and hand. He then began to rub his left hand up and down her legs, commenting on the smoothness of her upper thighs and the "prickliness" of her lower legs. Appellant moved his hand inside Britney's shorts to rub her right thigh, an erogenous zone under R.C. 2907.01(B). When Britney moved her legs away, appellant grabbed her legs and pulled them back down. He constrained Britney's legs by holding them down "tighter" than before, thereby using force. While holding her legs with his right arm, appellant used his left hand to start rubbing Britney's legs once again. Only this time, appellant went further up Britney's shorts, reaching under her underwear and touching her vagina, another erogenous zone. Britney testified appellant cupped her pubic area with his fingers and put his thumb between the lips of her vagina. Appellant was using such force to hold Britney's legs that Britney was initially unable to pull away from appellant. She testified she could not get away "at first." However, Britney was eventually able to move away, pulling her legs from appellant's arm, thereby requiring him to remove his thumb from the lips of her vagina and pull his hand out from her shorts.

{¶ 42} Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of gross sexual imposition

proven beyond a reasonable doubt. Appellant's actions in grabbing Britney's legs and restraining them with his arm so that he could rub her upper thighs and reach under her shorts and underwear to touch her pubic area and vagina is sufficient to prove the force necessary for the commission of the offense. The State, therefore, presented sufficient evidence of gross sexual imposition and appellant's first assignment of error is overruled.

{¶ 43} Appellant maintains that even if there was sufficient evidence to support his conviction, the conviction is nonetheless against the manifest weight of the evidence because Britney's testimony is not credible. Appellant contends Britney recanted the allegations made against him by texting Lisa that everything she had said was a lie and had been made up because she was angry at Mother and appellant. Appellant further maintains that Britney's trial testimony cannot be believed because Britney is a dishonest individual, known for lying, catfishing people on the internet, and stealing money and prescription drugs. He argues the weight of the evidence demonstrates that Britney lied about the sexual touching because she was angry at him for stopping Mother's "party mom" ways and encouraging Mother to be stricter with the children. Finally, he argues the jury could not have found Britney credible, as they acquitted him on the rape and sexual battery charges.

{¶ 44} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the original trier of fact. *State v. Hollon*, 2025-Ohio-2725, ¶ 20 (12th Dist.); *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). "'The jury is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony.'" *State v. Watson*, 2025-Ohio-883, ¶ 13 (12th Dist.), quoting *State v. Fox*, 2009-Ohio-556, ¶ 18 (12th Dist.). "[I]t [is] within the province of the jury, as the trier of fact, to take note of

any inconsistencies in the testimony and resolve them accordingly, believing all, part, or none of each witness's testimony." *State v. Lark*, 2018-Ohio-4940, ¶ 29 (12th Dist.), citing *State v. Woodard*, 2017-Ohio-6941, ¶ 24 (12th Dist.). "A conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony offered by the prosecution." *State v. Baker*, 2020-Ohio-2882, ¶ 31 (12th Dist.).

{¶ 45} The fact that the jury acquitted appellant of rape and sexual battery does not mean the jury found that Britney was not a believable witness. Both the rape and sexual battery offenses required the state to prove that appellant engaged in "sexual conduct" with Britney, whereas the gross sexual imposition offense appellant was convicted of only required proof of "sexual contact."[3] Sexual conduct is defined in R.C. 2907.01(A) as

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

Britney testified at trial that appellant's thumb, though between the lips of her vagina, "did not go in," or penetrate, her vagina. Given such testimony, the jury was entitled to find that the State failed to meet its burden of proving sexual conduct. However, the jury was free to find that Britney's testimony credibly described sexual contact in appellant's actions of rubbing her thigh, touching her pubic area, cupping her vagina, and placing his thumb between the lips of her vagina.

___

3. Appellant was charged with sexual battery under former R.C. 2907.03(A)(5), which provided that "[n]o person shall engage in *sexual conduct* with another, not the spouse of the offender, when . . . [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." (Emphasis added.) The statute has since been amended to substitute "sexual activity" for the term "sexual conduct."

{¶ 46} Britney's credibility and the veracity of her statements were challenged by defense counsel on cross-examination and through Lisa's and Mother's testimony. Britney was questioned about the text message she sent Lisa which allegedly recanted the allegations she had made against appellant. Britney explained that the message had been drafted and sent to her by Lisa, with instructions to modify the text to make it sound more like her own words. Britney testified she only sent the message to Lisa to ask what exactly Lisa and Mother wanted her to say. Britney indicated she never actually sent the message to Mother because the contents of that message were a lie. Appellant had touched her thighs and vagina on February 27, 2023.

{¶ 47} Appellant's witnesses painted Britney as someone prone to lying and deceitful behavior, pointing out that she had catfished others online, stolen money and prescription drugs, and lied to Mother and others in the past. Lisa and Mother also suggested Britney had falsely accused appellant of inappropriate sexual behavior out of anger for the changes that he had made in Mother's life, which caused Mother to become a stricter parent. Though Britney admitted on cross-examination that appellant has never been "one of her favorite people," she denied that she had levied false accusations against him. She testified that her trial testimony was the truth—appellant had grabbed her legs, rubbed his hand up her thigh and under her shorts and panties to cup her vagina and place his thumb between the lips of her vagina.

{¶ 48} The jury chose to credit Britney's testimony, which was supported by text messages produced from the evening in question. On the date of the incident, Britney had texted Mother and Rick that appellant was doing something that made her feel "uncomfy" and begged Rick to come get her because appellant was "being weird." She texted Lisa, "please come over here. Please. [Appellant's] being weird. . . . He's drunk and he was tryna touch all on me earlier. . . . And he keeps coming in here and laying in

my bed. . . . He was putting his hands up my pants . . . . And he kept putting my legs over his legs and rubbing on my thighs." Weeks later, when texting Tiffiny about the incident, Britney's account of the events did not change. Britney informed Tiffany that appellant had gotten drunk, tried to get her to drink with him, followed her around the house "talkin[g] [a]bout boobs and how he has no balls," grabbed her legs and put them over his, and talked about how her legs were "prickly down [t]here" and "smooth up" on her thigh before sticking his hands up her shorts and putting his hands on her "cooch." Britney's account of the events remained consistent over time.

{¶ 49} Based on the foregoing evidence, we find that the manifest weight of the evidence supported appellant's conviction. The jury did not clearly lose its way in concluding that appellant was guilty of gross sexual imposition. Accordingly, appellant's second assignment of error is overruled.

{¶ 50} Assignment of Error No. 3:

{¶ 51} THE IMPOSITION OF THE MAXIMUM SENTENCE WAS NOT SUPPORTED BY THE RECORD.

{¶ 52} In his third assignment of error, appellant contends the trial court erred by imposing an 18-month prison term for his gross sexual imposition conviction. Appellant argues the court should have imposed a community control sanction as he has never been incarcerated and his only conviction is for a 1997 misdemeanor DUI. He further maintains that the imposition of the maximum prison term for his fourth-degree felony conviction "indicates that the trial court considered factors or considerations that are extraneous to those that are permitted by R.C. 2929.11 and R.C. 2929.12 and failed to consider the overall statutory principles and policies underlying felony sentencing."

{¶ 53} A felony sentence is reviewed under the standard set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 1. Pursuant to R.C. 2953.08(G)(2),

an appellate court can modify or vacate a sentence only if it clearly and convincingly finds either of the following:

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

> (b) That the sentence is otherwise contrary to law.

As used in R.C. 2953.08(G)(2)(b), the phrase "otherwise contrary to law" means "'in violation of statute or legal regulations at a given time.'" *State v. Jones*, 2020-Ohio-6729, ¶ 34, quoting *Black's Law Dictionary* (6th Ed. 1990). *See also State v. Bryant*, 2022-Ohio-1878, ¶ 22. "A sentence is not clearly and convincingly contrary to law. where [a] trial court 'considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range.'" *State v. Haruyama*, 2022-Ohio-4225, ¶ 8 (12th Dist.), quoting *State v. Ahlers*, 2016-Ohio-2890, ¶ 8 (12th Dist.).

{¶ 54} "R.C. 2953.08(G)(2) does *not* permit an appellate court to conduct an independent review of a trial court's sentencing findings under R.C. 2929.12 or its adherence to the purposes of felony sentencing under R.C. 2929.11." (Emphasis added.) *Bryant* at ¶ 21, citing *Jones* at ¶ 41-42. Nothing within the statute permits an appellate court to "independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *Jones* at ¶ 42. *See also State v. Lopez-Cruz*, 2023-Ohio-257, ¶ 7 (12th Dist.). However, an appellate court is not prohibited from reviewing a sentence "when the claim is that the sentence was imposed based on impermissible considerations—i.e., considerations that fall outside those that are contained in R.C. 2929.11 and 2929.12." *Bryant* at ¶ 22. "[W]hen a trial court imposes a sentence based on

- 19 -

factors or considerations that are extraneous to those that are permitted by R.C. 2929.11 and 2929.12, that sentence is contrary to law." *Id.*

{¶ 55} Following our review of the record, we find that appellant's sentence is not contrary to law. The imposition of an 18-month prison term falls within the permissible statutory range for a fourth-degree felony offense; s*ee* R.C. 2929.14(A)(4); and a five-year mandatory term of postrelease control was properly imposed for the felony sex offense. *See* R.C. 2967.28(A)(3) and (B)(1). In imposing appellant's sentence, the trial court noted, both at the sentencing hearing and in its sentencing entry, that it had considered the overriding purposes of felony sentencing in accordance with R.C. 2929.11 as well as the seriousness and recidivism factors set forth in R.C. 2929.12. Though appellant believes a shorter prison term or even a community control sanction is a more appropriate sentence given his limited criminal history, we are precluded from second-guessing or independently weighing the evidence and substituting our judgment for that of the trial court. *See Jones* at ¶ 42.

{¶ 56} Furthermore, appellant's argument that the trial court considered "factors or considerations that are extraneous to those that are permitted by R.C. 2929.11 and R.C. 2929.12" is not supported by the record. Rather, the record reflects that when sentencing appellant the trial court was focused on the facts of the underlying offense, the seriousness of appellant's conduct, appellant's risk of recidivism, the need to protect the public, and the need to punish the offender. In imposing the 18-month prison term, the trial court stated the following:

> THE COURT: Well, I've considered the purposes – the purposes and principles of sentencing. The statements made here today, the pre-investigation report, the purposes are to protect the public from future crime by the offender and others. And to punish the offender using the minimum sanctions that the Court determines accomplish those purposes without

imposing an unnecessary burden on the State or local government resources.

The key that I'm focusing on at this point is protecting the public. It's one thing to have a trial. He was found not guilty of rape. He was found not guilty of [sexual battery]. A jury obviously carefully considered this and found him guilty of gross sexual imposition. He's offered no real remorse. He strikes me as indifferent about the whole thing. I'm sure it goes beyond that, but as far as in the courtroom, his demeanor, I think this is a mixture of excessive consumption of alcohol and his desire to abuse this child.

Therefore, his sentence is 18 months.

As nothing in the record indicates appellant's sentence was based on impermissible considerations, that is, considerations that fall outside those set forth in R.C. 2929.11 and 2929.12, we find no merit to appellant's argument. The sentence imposed by the trial court was not clearly and convincingly contrary to law, and appellant's third assignment of error is overruled.

{¶ 57} Judgment affirmed.

PIPER and SIEBERT, JJ., concur.

---

# JUDGMENT ENTRY

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Melena S. Siebert, Judge